RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

JAN 0 8 2025

FILED
DOCKETED _____
DATE      INITIAL

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 3. Petition for Review of Order of a Federal Agency, Board, Commission, or Officer

Name of Federal Agency, Board, Commission, or Officer:

Administrator, U. S. Environmental Protection Agency

Date of judgment or order you are challenging: Oct. 4, 2024

Fee paid for petition?   ○ Yes   ● No

**List all Petitioners** *(List each party filing the petition. Do not use "et al." or other abbreviations.)*

Genghmun Eng

For immigration cases:

Alien Number(s):

Is petitioner(s) detained?     ○ Yes    ○ No

Has petitioner(s) moved the BIA to reopen?     ○ Yes    ○ No

Has petitioner(s) applied to the district director for an adjustment of status?     ○ Yes    ○ No

Have you filed a previous petition for review from this agency? ● Yes    ○ No

If Yes, what is the prior 9th Circuit case number?

Your mailing address:

5215 Lenore Street

City: Torrance    State: CA    Zip Code: 90503

Prisoner Inmate or A Number (if applicable):

**Signature** Genghmun Eng *Genghmun Eng*    **Date** 01/04/2025

*Complete and file with the attached representation statement and the order being challenged.*
*See, e.g., Circuit Rule 15-4.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 3**        *1*        *Rev. 12/01/2018*

## Representation Statement for Petition for Review

**Petitioner(s)** *(List **each** party filing the petition, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Genghmun Eng

Name(s) of counsel (if any):

Pro se

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?  ○ Yes  ⦿ No

**Respondent(s)** *(List only the names of parties and counsel (if known) who will oppose you in the petition. List separately represented parties separately.)*

Name(s) of party/parties:

Dr. Jane Nishida, US EPA Acting Administrator, Mr. Gerardo Rios, US EPA Region 9 Air Permits Manager, Dr. Bhaskar Chandan, SCAQMD Senior Air Quality Engineering Manager

Name(s) of counsel (if any known):

Address:

Telephone number(s):

Email(s):

*To list additional parties and/or counsel, attach additional pages as necessary.*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 3**                                        2                          *Rev. 12/01/2018*

**What is the filing fee for a petition (or a case that seeks review of a federal agency decision)?**

The filing fee for a petition for review is $600 and it is paid to the Ninth Circuit. You may pay either by check or money order, made out to "US Courts." If you do not have money to pay the filing fee, you can ask the Ninth Circuit to waive the filing fee by filing a "motion to proceed in forma pauperis." You may use Form 4.

# Needs $600 to "US Courts"

Cover Page for Petition for Review by U.S. Court of Appeals

## PETITION FOR REVIEW OF US EPA ADMINISTRATOR OCT. 4, 2024

## ORDER DENYING A PETITION FOR OBJECTING TO A TITLE V

## OPERATING PERMIT, re: Petition No. IX-2024-14

Court of Appeals Case No. _____
before Judge _____
U.S. Court of Appeals, Region 9
125 South Grand Avenue, Pasadena, CA 91105

Appellant: Dr. Genghmun Eng
5215 Lenore Street, Torrance, CA 90503
Landline: (310) 316-1187, Cell Phone: (310) 770-9257
[geng001@socal.rr.com]

_____          _5 Jan 2025_
Genghmun Eng                              Date

i-vii

UNITED STATES COURT OF

APPEALS FOR THE NINTH CIRCUIT

GENGHMUN ENG

5215 Lenore Street, Torrance, CA 90503

*Appellant and Petitioner, pro se,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY {"US EPA"} and

MICHAEL S. REGAN {"Administrator"}, Administrator, or

DR. JANE NISHIDA {"Administrator"}, Acting Administrator,

United States Environmental Protection Agency

　　and

REGION 9 OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

{"US EPA Region-9 Staff"}

　　and

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT {"SCAQMD"}

*Respondents.*

**PETITION FOR REVIEW OF US EPA ADMINISTRATOR OCT. 4, 2024**

**ORDER DENYING A PETITION FOR OBJECTING TO A TITLE V**

**OPERATING PERMIT, re: Petition No. IX-2024-14**

i-vii

# Certificate of Interested Parties

TO BE FILED IN THE COURT OF APPEAL **APP-008**

| **COURT OF APPEAL** 9th District **APPELLATE DISTRICT, DIVISION** | COURT OF APPEAL CASE NUMBER: |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:   STATE BAR NUMBER:
NAME: Dr. Genghmun Eng
FIRM NAME: pro se
STREET ADDRESS: 5215 Lenore Street
CITY: Torrance   STATE: CA   ZIP CODE: 90503
TELEPHONE NO.: (310) 770-9257   FAX NO.:
E-MAIL ADDRESS: geng001@socal.rr.com
ATTORNEY FOR (name):

SUPERIOR COURT CASE NUMBER:

APPELLANT/ Dr. Genghmun Eng
PETITIONER:
RESPONDENT/   US EPA and Michael S. Regan, Administrator; Region 9
REAL PARTY IN INTEREST: of the US EPA; SCAQMD

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

*(Check one):*  [X] INITIAL CERTIFICATE   [ ] SUPPLEMENTAL CERTIFICATE

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party *(name )*: Genghmun Eng

2. a. [ ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [X] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest *(Explain):* |
|---|---|
| (1) Ultramar, Inc.,Valero Energy Corp. subsidiary | Petitioner seeks defect curing in Ultramar Title-V 2024 Permit Renewal |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date: Dec. 31, 2024

Genghmun Eng
(TYPE OR PRINT NAME)

*Genghmun Eng*
(SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use   **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**   Cal. Rules of Court, rules 8.208, 8.488
Judicial Council of California   www.courts.ca.gov
APP-008 [Rev. January 1, 2017]

## TABLE OF CONTENTS

[Section A] Introduction _____ 1

[Section B] Statements of Case _____ 3

[Section C] Statement of Applicability _____ 7

[Section D] Standard of Review Sought by Petitioner _____ 7

[Section E] Statement of Facts _____ 8

[Section F] Arguments, Part 1 _____ 9

[Section G] Arguments, Part 2 _____ 24

[Section H] Proposed Remedies _____ 37

[Section I] Conclusions _____ 42

[Section J] Certificate of Compliance _____ 42

[Section K] Certificate of Service to Interested Parties _____ 43

# TABLE OF AUTHORITIES

**Statutes**

CAA {'Clean Air Act', generic reference} _____ 11, 20, 21, 26

"CAA Appeal No. 24-11" {combination} _____ 2, 8

Clean Air Act § 307(b)(1) _____ 1, 8

CAA § 307(d)(9) _____ 21

40 CFR, Part 68 {generic reference} _____ 11, 37

40 CFR §68.215 _____ 12, 31

40 CFR §68.215(a)(ii) _____ 32

40 CFR Part 70 {generic reference} _____ 11, 12, 13, 21, 32

40 CFR Part 71 {generic reference} _____ 31

"CAA, *40 CFR Part 68*, or *40 CFR Part 70*" {combination}_____ 18, 21, 33

"CAA, *40 CFR Part 70*, or *40 CFR §68.215*" {combination} _____ 10, 13-19

40 CFR 70.6(a)(6)(i) _____ 20, 26, 32

42 USC Sect. 7607(b)(1) _____ 1, 8

42 USC 7607(d)(9) _____ 21

FRAP 9th Circuit Rules 15, 15-1, 15-2 _____ 1

FRAP 9th Circuit Rules 30-1, 30-1.1, 30-1.2(a), 30-1.2(e), 30-1-3 _____ 1

**Other Authorities**                                  **Page Numbers**

*{Exhibit-01}* [10/4/2024] _____ 1, 6, 8, 12, 13

US EPA Administrator Denial of Petition IX-2024-15 in its Entirety.

*{Exhibit-02}* [7/15/2024] _____ 2, 6, 8, 10, 25, 38

Petitioner's Petition IX-2024-14 to US EPA Administrator.

*{Exhibit-03}* [11/8/2024] _____ 2, 6, 8

Publication of US EPA Administrator Petition Denial in Federal Register.

*{Exhibit-04}* [10/26/2024] _____ 2, 6, 8, 25

Appeal to Environmental Appeals Board (EAB): CAA Appeal No. 24-11.

*{Exhibit-05}* [11/7/2024] _____ 2, 6, 8

EAB Dismissal of CAA Appeal No. 24-11 Due to Lack of Jurisdiction.

*{Exhibit-06}* [Fall 2024] _____ 2

Robert Brundage and Kimberly Parrish,

"Article III Standing to Appeal in Federal Court: What Business Lawyers

Need to Know", *Defense Counsel Journal*, Fall 2024, pp. 1-25

*{Exhibit-07}* [9/23/2023] _____ 3, 20

Petitioner Initial Public Comments, Valero-Ultramar Title-V Permit Renewal.

*{Exhibit-08}* [9/24/2023] _____ 4, 20

Petitioner Follow-on Public Comments, Valero-Ultramar Title-V Permit Renewal.

*{Exhibit-09}* [4/5/2024] _____ 4, 20, 21, 31, 37

SCAQMD 19 Page Response to Public Comments, re: Title-V Permit Renewal.

*{Exhibit-10}* [5/8/2024] _____ 4, 6, 10, 25, 27, 41, 42

Petitioner's *Emergency Petition* to US EPA Region-9, re: Title-V Permit Renewal.

*{Exhibit-11}* [undated] _____ 7, 10, 21, 25, 26, 34, 42, 43

10-page Extract from 693-page LAFD-CUPA Document Release of 12/25/2023.

*{Exhibit-12}* [6/18/2023] _____ 5

US EPA Region-9 Staff Letter to Petitioner, suggesting a Formal Petition.

*{Exhibit-13}* [5/10/2005] *[doi:10.1186/1476-069X-4-6]* _____ 24

Edward Broughton, "The Bhopal Disaster and Its Aftermath: A Review",

*Environmental Health: A Global Access Science Source.*

*{Exhibit-14}* [undated] _____ 34

Entire 55-page Valero-Ultramar Chemical Inventory, extracted from pp. 236-294

of the 693-page LAFD-CUPA Document Release of 12/25/2023.

*https://selfhelp.appellate.courts.ca.gov/knowledge-center/opening-brief/* __ 1, 7

## [Section A] INTRODUCTION

**[A-1]:** It is Petitioner's understanding that Ninth Circuit normally requires Petitioner to file Excerpts of Record {"Excerpts"} with the opening brief [Circuit Rule 30-1, Rule 30-1.1], and separate those Excerpts from the brief, but submit them electronically concurrently with the brief [Circuit Rule 30-1, Rule 30-1.1, 30-1.2(a), 30-1.2(e)], except that such Excerpts are not required for a *pro se* party. However, the *pro se* party can cite documents in their opening brief [Rule 30-1-3], which is Petitioner's case here, and *pro se* proceedings also does not require a Mediation Questionnaire [Circuit Rule 15-2]. This *'Petition for Review'* to the US Court of Appeals document follows the format suggested in:

*https://selfhelp.appellate.courts.ca.gov/knowledge-center/opening-brief/*

**[A-2]:** Pursuant to Clean Air Act § 307(b)(1), 42 USC § 7607(b)(1); Rule 15 of the Federal Rules of Appellate Procedure (FRAP) for the Ninth Circuit; and Circuit Rule 15-1, Petitioner hereby petitions the Court for review of the final action taken by the US EPA Administrator Michael S. Regan, entitled *"Order Denying a Petition for Objection to a Title V Operating Permit"* (Oct. 4, 2024) *{Exhibit-01}*, as a response Petitioner's *"33-Page Amended Petition to the US EPA Administrator to Object to the Region 9 Permit Renewal as Constituted on May 28, 2024 for the Valero-Ultramar Wilmington HF Refinery, 2402 East Anaheim Street, Wilmington,*

*90744 and Requesting that the US EPA Require Needed Permit Additions and Modifications as Outlined Herein*" of July 15, 2024, Petition No. IX-2024-14 *{Exhibit-02}*, which Administrator denied in its entirety. Notice was published on Nov. 8, 2024, as FRL-12350-01-R9 in the Federal Register (Vol. 89, No. 217, page 88762), FR Doc. 2024-25944 *{Exhibit-03}*.

**[A-3]:** On Oct. 26, 2024, Petitioner appealed to the US EPA Environmental Appeals Board (EAB) in a 6-page filing, highlighting the two most critical Petition No. IX-2024-14 items. It was assigned ID-PINT-DAGV66, and later designated as CAA Appeal No. 24-11 *{Exhibit-04}*. On Nov. 7, 2024, the EAB dismissed Petitioner's Appeal due to Lack of Jurisdiction *{Exhibit-05}*, which now brings the matter of the original full Petition No. IX-2024-14 denial by the Administrator to the US Court of Appeals.

**[A-4]:** Petitioner also claims standing for this *'Petition for Review'* under Article III of the United States Constitution *{Exhibit-06}*, since a large-scale "Category-4" Catastrophic Hydrogen Fluoride (HF) Release by the Refinery Operator that goes "Outside the Refinery" will have immense off-site impacts, including long-term injury to people's health, including Petitioner's, and the environment. Petitioner further claims the defects identified herein need curing, and the Remedies Sought herein are needed to help minimize or reduce those immense off-site impacts.

## [Section B] STATEMENTS OF CASE

The Valero-Ultramar Title-V Permit Renewal had 3 Public Comment periods:

**[B-1]:** A 45-day Public Comment period, when US EPA released its Valero-Ultramar Draft Title-V Permit Renewal, before sending it to the SCAQMD.

**[B-2]:** A SCAQMD Public Comment Period, ending on 9/26/2023, which only 2 members of the Public participated in, one being the Petitioner, and the other being the Torrance Refinery Action Alliance [TRAA]. During the this **[B-2]** Public Comment period, Petitioner submitted 3 documents covering multiple concerns, summarized below as A-2{i} through A-2{iii}.

**[B-2{i}]:** In his earliest Public Comments to the SCAQMD on the Valero-Ultramar Title-V Permit Renewal, Petitioner identified the additional need for:

*"[i] Better identification of Refinery Risk Factors (RRF) ... [iii] a Refinery Risk Reduction Plan (RRRP), and [iv] a compilation of Net Refinery Risk Reduction achieved to date for each RRF ... with special attention paid to the Refinery HF/MHF Alkylation Unit." {Exhibit-07, 9/23/2023, Notes 1 & 5}*

**[B-2{ii}]:** In his next SCAQMD Public Comments on the Valero-Ultramar Title-V Permit Renewal, Petitioner identified further concerns in the Draft-Title-V Permit in the Refinery Voluntary Risk Reduction Plan (VRRP), due to the VRRP ignoring:

*"[i] the potential for large-scale HF/MHF releases .. [iii] the need for specific Refinery Response plans tailored to small, medium, large, and extreme HF/MHF releases, with special attention paid to earthquake, terrorist, or cyber-attack mediated release scenarios; as well as [iv] the need for Refinery coordination plans with Police, Fire, and Public Agencies."* {Exhibit-08; 9/24/23, Notes F & L}

**[B-3]:** On or about 4/5/2024, the SCAQMD released a 19-page response to these Public Comments *{Exhibit-09}*, noting that 'no changes were made' to the Draft-Title-V as a result of these 2 Public Comments, which was sent to the US EPA. Petitioner's understanding is that this SCAQMD response was a qualified Agency Comment for the Title-V Permit Renewal, which obligated the US EPA to initiate a follow-on 4/5/2024 to 5/20/2024 US EPA 45-day Public Comment period.

**[B-3{i}]:** On 5/8/2024, within the new 45-day Public Comment period, Petitioner submitted an extensive 29-page document to the US EPA Region-9 Staff, entitled: *"Emergency Petition to the US EPA for Timely and Needed Additions and Modifications to the Proposed Title V Permit Renewal for the Valero Ultramar HF Refinery"* {Exhibit-10}.

**[B-3{i}(a)]:** This *Emergency Petition* expanded the scope of Petitioner's concerns, due to access to a new 693-page document from the Los Angeles Fire Department (LAFD) Certified Unified Program Agency (CUPA), which was only disclosed due

4

to a TRAA Public Records Act (PRA) request. This 693-page document *{Timestamp 12/25/2023, 2:49 PM}* contained the entire LAFD CUPA *permit record* to date with respect to the Valero-Ultramar Wilmington HF Refinery. Because this *Emergency Petition* was timely, it provided Petitioner standing to bring forth further issues, expand the scope of prior issues, and added further weight to issues Petitioner already raised *{see Exhibit-11}*.

**[B-3{i}(b)]:** In his *Emergency Petition*, Petitioner labeled this 693-page document: "2022_PEER-PRA-Response_ValeroWilmington_ALL-LAFD-Docs_693pp.pdf" due to his belief then that the PRA originated from PEER (Public Employees for Environmental Responsibility). Petitioner's understanding now is that a member of the Torrance Refinery Action Alliance (TRAA) initiated the PRA request, and TRAA made this document available to Petitioner for Petitioner's *Emergency Petition* to the US EPA Region-9 Staff.

**[B-3{ii}]:** On or about May 28, 2024, the SCAQMD issued their Final Title-V Permit Renewal (Revision #149) to Valero-Ultramar [Facility ID 800026].

**[B-3{iii}]:** On 6/18/2024 *{Exhibit-12}*, US EPA Region-9 Staff responded to Petitioner's *Emergency Petition*, by notifying Petitioner that US EPA Region-9 Staff were not objecting to the Final Valero-Ultramar Title-V Permit Renewal, while encouraging Petitioner to submit a Formal Petition directly to the US EPA

Headquarters (Research Triangle Park, Durham, NC), requesting that the US EPA Administrator, Michael S. Regan, issue a formal Objection to granting the Final Title-V Permit Renewal. This new Petition period started just after the US EPA 45-day Public Comment period, running from 5/21/2024-7/18/2024 *{Exhibit-12}*.

**[B-4]:** On 7/15/2024, Petitioner submitted such a Formal Petition, which was assigned Petition No. IX-2024-14 *{Exhibit-02}*.

**[B-5]:** On 10/4/2024, the US EPA Administrator denied Petition IX-2024-14 in its entirety *{Exhibit-01}*, with Notice published on 11/8/2024 as FRL-12350-01-R9 in Federal Register, Vol. 89, No. 217, p. 88762; FR Doc. 2024-25944 *{Exhibit-03}*.

**[B-6]:** On or about 10/26/2024, Petitioner extracted 2 major concerns from Petition IX-2024-14, and submitted a Brief Appeal *{Exhibit-04, 10/26/2024}* on these 2 major concerns to the US EPA Environmental Appeals Board (EAB). Both major concerns were also part of his *Emergency Petition {Exhibit-10, 5/8/2024}*.

**[B-7]:** On or about 11/7/2024, the EAB dismissed Petitioner's Brief Appeal, due to lack of Jurisdiction *{Exhibit-05, 11/7/2024}*.

**[B-8]:** These 2 major concerns are captured here in the present document as the follow-on **[Section F]** *"Defective, Incomplete, and Inaccurate Permit Records."*

## [Section C] STATEMENT OF APPLICABILITY

Petitioner claims that the US EPA Administrator Denial of Petitioner's Petition No.

IX-2024-14 in its entirety is a non-final judgment by virtue of Petitioner's present

U.S. Appeals Court *'Petition for Review'* being allowed.


## [Section D] STANDARD OF REVIEW SOUGHT BY PETITIONER

Petitioner here seeks that the US Court of Appeals apply the *de novo* standard for

the present Petitioner's *'Petition for Review'*, which *"does not defer to the*

*decisions made in the trial court {or Administrator}. Instead the Court of Appeal*

*looks at the issue as if the trial court {or Administrator} had never ruled on it. This*

*type of review is generally limited to issues involving questions of law. It is the*

*most favorable standard of review for an appellant."*

*{selfhelp.appellate.courts.ca.gov/knowledge-center/opening-brief/}.*

7

## [Section E] STATEMENT OF FACTS

Pursuant to Clean Air Act § 307(b)(1), 42 USC § 7607(b)(1); Rule 15 of the

Federal Rules of Appellate Procedure (FRAP) for the Ninth Circuit; and Circuit

Rule 15-1, Petitioner petitions the Court here for review of US EPA Administrator

Michael S. Regan, Order entitled *"Order Denying a Petition for Objection to a*

*Title V Operating Permit"* (Oct. 4, 2024) *{Exhibit-01}*, as a response Petitioner's

*"33-Page Amended Petition to the US EPA Administrator to Object to the Region 9*

*Permit Renewal as Constituted on May 28, 2024 for the Valero-Ultramar*

*Wilmington HF Refinery, 2402 East Anaheim Street, Wilmington, 90744 and*

*Requesting that the US EPA Require Needed Permit Additions and Modifications*

*as Outlined Herein"* of July 15, 2024, Petition No. IX-2024-14 *{Exhibit-02}*, which

Administrator denied in its entirety. Notice was published on Nov. 8, 2024, as

FRL-12350-01-R9 in the Federal Register (Vol. 89, No. 217, page 88762), FR Doc.

2024-25944 *{Exhibit-03}*. On Oct. 26, 2024, Petitioner prepared a 6-page Brief

Appeal to the US EPA Environmental Appeals Board (EAB) [ID-PINT-DAGV66,

{CAA Appeal No. 24-11}] *{Exhibit-04}*, highlighting the two most critical Petition

No. IX-2024-14 items. On Nov. 7, 2024, the EAB dismissed Petitioner's Appeal

due to Lack of Jurisdiction *{Exhibit-05}*, which brings Petition No. IX-2024-14

denial by the Administrator to the US Court of Appeals.

## [Section F] ARGUMENTS, PART ONE

**[F-1]:** Petitioner claims here the *de novo* standard should be applied to this US Appeals Court *'Petition for Review'* as 3 potential faults were found in the US EPA Administrator denial of Petitioner's Petition IX-2024-14 that Petitioner claims involve questions of Law, as covered in the next **[F-3]** and **[F-4]** subsections; in addition to numerous *'Defective, Incomplete, and Inaccurate Permit Records'* also being found, which can be grouped into 2 major concerns as noted in above **[B-8]**, which are further detailed in the following **[Section G]**. These 2 major concerns were first highlighted in Petitioner's *Emergency Petition {Exhibit-10, 5/8/2024}*, and carried forward in Formal Petition IX-2024-14 *{Exhibit-02, 7/15/2024}*, then to Petitioner's EAB Brief Appeal *{Exhibit-11, 10/26/2024}*, which the EAB dismissed due to EAB Lack of Jurisdiction, so these 2 major concerns are now brought to the US Appeals Court, as part of this Petitioner's US Appeals Court *'Petition for Review'*.

Petitioner claims here that these 2 major concerns, if validated, comprise ***de facto noncompliances*** by the Refinery Operator, and that they also are ***prima facie*** defects, incompletenesses, or inaccuracies in the *permit, permit process, or permit record*, which can be adjudicated as a stand-alone items, without need for citing specific portions of any particular Regulatory document.

9

In addition, any validated *prima facie* defect, incompleteness, or inaccuracy, may compromise other aspects of the *permit, permit process, or permit record*, and may impact other Regulatory documents, creating implicit *noncompliance* conditions within those documents.

As a result, Petitioner further claims here that when alleged *prima facie* defects, incompletenesses, or inaccuracies in the *permit, permit process, or permit record*, can be adjudicated as a stand-alone items, without the need for Petitioner to specifically cite Regulatory Agency document sections, then the US EPA Administrator and/or Regulatory Agencies should be required to adjudicate those items, and to either validate or refute these *prima facie* claims. This process will then allow the remaining, now validated, *prima facie* claims to be used by the US EPA Administrator, Regulatory Agency, or any other Agencies, to determine if these validated *prima facie* defects, incompletenesses, or inaccuracies in the *permit, permit process, or permit record*, impacts any other documents or operations within their purview, including:

**[F-1a]:** Whether the validated *prima facie* defect, incompleteness, or inaccuracy creates further *noncompliances* in the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or other Regulatory Documents, allowing Regulatory Agencies to demand curing of those newly identified *noncompliances* by the Refinery Operator;

10

**[F1-b]:** Whether the validated *prima facie* defect, incompleteness, or inaccuracy creates follow-on concerns for other Agencies, including Police, Fire, and Health Agencies, that may have implicitly relied on all Refinery Operator *permit, permit process, and permit records* being accurate, complete, and non-defective.

**[F-2]:** ALTERNATIVE STATUTORY CODE NAMES

The CAA Clean Air Act is also '42 USC Chapter 85, Sects. 7401 – 7438'; while *40 CFR Part 70* is also 'Title 40, Chapter I, Sub-chapter C, Part 70, Sects. 70.1 – 70.14, and Appendix A'; and *40 CFR Part 68* is also 'Title 40, Chapter I, Sub-chapter C, Part 68, Subparts A – H, and Appendix A, Sects. 68.1 – 68.220'.

**[F-3]:** CRITICAL AGENCY TEXTS REGARDING PETITION DENIAL

**[F-3a]:** As part of *Emergency Petition* denial, the US EPA Region-9 noted that Petition grounds for an Administrator Objection must be based on claims that "*the permit, permit record, or permit process is not in compliance with applicable requirements of the Clean Air Act (CAA) or the regulations in 40 CFR Part 70*".

**[F-3b]:** As part of Petition IX-2024-14 Denial, US EPA Administrator noted:

**[F-3b(i)]:** "*Petitioner must demonstrate that the permit does not include, **assure compliance with**, or otherwise satisfy a CAA-based requirement. Here, the Petitioner does not identify any applicable requirement with which the Permit does not comply.*" *{Exhibit-01, p. 7 of 17}.*

11

**[F-3b(ii)]:** *"Title V permits are not required to contain information related to an RMP beyond the requirements specified in 40 CFR §68.215. The Petitioner does not allege that the permit does not satisfy or include the requirements specified in 40 CFR §68.215 ..."* {Exhibit-01, p. 12}.

**[F-3b(iii)]:** *"The Petitioner seeks to use the title V permitting process to revise the terms of the facility's underlying RMP itself."* {Exhibit-01, p. 12}.

**[F-4]:** POTENTIAL FAULTS IN AGENCY PETITION DENIALS

**[F-4a]: First Petition Denial Potential Fault Identified**

Petitioner claims here that the US EPA Administrator erred in **[F-3b(i)]** by faulting Petitioner for not identifying a *'CAA-based requirement'*, as if that was the **only** necessary statutory code before the US EPA Administrator would adjudicate the merits of Petitioner's concerns; and the US EPA Administrator further erred in **[F-3b(ii)]** by faulting Petitioner for not identifying a *'40 CFR §68.215 requirement'*, as if that was the **only** necessary statutory code before the US EPA Administrator would adjudicate the merits of Petitioner's concerns. Both cannot simultaneously true as the **only** necessary statutory code for US EPA Administrator action. Furthermore, US EPA Region-9 Staff noted, in contrast, that either of the *'requirements of the Clean Air Act (CAA) or the regulations in 40 CFR Part 70'* might be acceptable.

Thus, Petitioner claims here these texts demonstrate that ambiguities are present as to what constitutes the necessary statutory code that a Petitioner must cite in their Petition, under threat of Petition dismissal.

In addition to these ambiguities, Petitioner claims when a *common sense reading* of a Petition claim or concern, by itself, as a stand-alone item, indicates its potential validity, Agencies should be required to adjudicate such items on their merits, without the necessity of having Petitioner cite specific sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or other Regulations, to bolster the validity of that Petition claim or concern. Petitioner seeks Court concurrence on this item.

## [F-4b]: Second Petition Denial Potential Fault Identified

US EPA Region-9 Staff noted that Petition grounds for Administrator Objection must be based on Petitioner claims "*the permit, permit record, or permit process is not in compliance with applicable requirements of the Clean Air Act (CAA) or the regulations in 40 CFR Part 70*". Here, when a Petition claim or concern alleges defects, incompletenesses, or inaccuracies are present in the "*the permit, permit record, or permit process*", where a *common sense reading* of that Petition claim or concern, by itself, as a stand-alone item, indicates its potential validity, Petitioner claims that if these defects, incompletenesses, or inaccuracies are found to be valid, they represent stand-alone *de facto* noncompliances by the Refinery

13

Operator.  Petitioner claims here that in this situation, where Petitioner alleges

potential *de facto noncompliances*, Agencies should be required to adjudicate those

Petitioner claims or concerns on their merits, to establish or refute claim or concern

validity, without needing Petitioner to cite specific CAA, *40 CFR Part 70*, *40 CFR*

*§68.215,* or other Regulatory sections.

*Noncompliance* covers a much broader range of possibilities than citing specific

sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*.  If a *noncompliances* is

intimately connected to a specific section or sections of the CAA, *40 CFR Part 70*,

or *40 CFR §68.215*, requiring citing those specific sections would be appropriate.

However, Petitioner claims here that stand-alone *de facto noncompliances* should

not require such citing, since they can be adjudicated as stand-alone items.  One

class of these *noncompliances*, covers the case of *permit records* being defective,

incomplete, or inaccurate.  A single validated defective, incomplete, or inaccurate

*permit record* may impact many Refinery Operator physical systems and

subsystems, and thereby touch many CAA, *40 CFR Part 70*, or *40 CFR §68.215*

sections and subsections.  In addition, it can compromise the Regulatory oversight

functions of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, due to fact that when

Regulatory Compliance documents and information are sent to various Agencies,

those Agencies may be implicitly relying on the presumption that the *permit*

14

*records* are accurate, complete, and non-defective *permit records*, for their development of actionable plans. A Refinery Operator promulgating defective, incomplete, or inaccurate *permit records* to various Agencies can then cause those Agency actionable plans to also have hidden defects, hidden incompleteness, or hidden inaccuracies.

In consideration of the above paragraphs, so as to minimize the possibility of having an actual defect, incompleteness, or inaccuracy in the *permit record* contaminate the entire Regulatory enterprise, Petitioner claims here, that if a *common sense reading* of any Petitioner's claims or concerns alleging *permit records* being defective, incomplete, or inaccurate; those claims and concerns should be adjudicated by Agencies on their merits, without the necessity of having Petitioner cite specific sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*. This comprises the second Petition Denial Potential Fault that Petitioner has identified, and Petitioner here seeks Court concurrence on this item.

### [F-4c]: Third Petition Denial Potential Fault Identified

When a Petitioner brings a claim or concern to a Regulatory Agency, must they be operating as a full *in loco parentis* substitute for what the Regulatory Agencies should have been doing, in the natural course of executing Agency duties with the proper due diligence? A concrete example will help clarify this question.

Suppose a Regulatory Agency finds a Refinery Operator *noncompliance*, it is their duty to bring the Refinery Operator back into *compliance*. As part of that task, the Regulatory Agency must determine for the Refinery Operator which portions of the CAA, *40 CFR Part 70*, or *40 CFR §68.215* provides the Regulatory Agency authority to demand Refinery Operator responses, so as to restore *compliance*. When a Petitioner brings a claim or concern to a Regulatory Agency alleging a Refinery Operator *noncompliance*, if the Regulatory Agency evaluates that alleged *noncompliance* on its merits, and finds that the Petitioner's alleged *noncompliance* constitutes an actual Refinery Operator *noncompliance*; Petitioner claims here that for maximum Regulatory Effectiveness, and to hew closest to the US EPA Charter of protecting the Heath and Environment, the Regulatory Agency should then bring their full weight and knowledge of the entire Regulatory landscape to identify all of the sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or any other Regulatory Codes that also become *noncompliant*, followed by demanding the Refinery Operator cure all *noncompliances* expeditiously. Here, the Petitioner and Regulatory Agencies are working together, to ensure maximum combined effectiveness. In this case, Petitioner would not need to cite any specific sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or any other Regulatory Codes, because that would be a ***de jure*** Regulatory Agency task that they are expert at.

16

On the other hand, when a Petitioner brings a claim or concern to a Regulatory Agency, alleging a Refinery Operator *noncompliance*, if the Regulatory Agency seeks to avoid evaluating that alleged *noncompliance* on its merits, and instead finds that the Petitioner's allegations are automatically defective and can be dismissed, because the the Petitioner did not also identify which CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or any other Regulatory Codes sections also become *noncompliant*; it means that the full ***in loco parentis*** responsibility now falls on the Petitioner, to act as a fully qualified Regulatory Agency substitute. Petitioner then has to perform both tasks that the Regulatory Agency normally does, which is to first identify the *noncompliance*, and then to comb through the entire Regulatory landscape to identify which sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or any other Regulatory Codes also become *noncompliant*. Petitioner would then have to pray that Regulatory Agency concurs with their selections, which then gives the Regulatory Agency yet another chance to minimize or dismiss the Petitioner's original claims and concerns. The Regulatory Agency now instead brings their full weight and knowledge of the entire Regulatory landscape to deny Petitions and Petitioner claims. Here, the Petitioner and Regulatory Agencies are working in opposition, which is likely to result in a minimum combined effectiveness. While there may be an extraordinary circumstance where the

17

Petitioner manages to successfully perform both tasks, as a full *in loco parentis* substitute for the Regulatory Agency experts, Petitioner claims here that this path achieves the least Regulatory Effectiveness overall, and hews furthest from the US EPA Charter of protecting the Heath and Environment.

This comprises the third Petition Denial Potential Fault: When Petitioner alleged *noncompliances* involve *permit records* being defective, incomplete, or inaccurate, Petitioner should not be required to cite specific sections of the CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or any other Regulatory Codes, to bolster the *noncompliance* claim, because a single defective, incomplete, or inaccurate *permit record* could affect many CAA, *40 CFR Part 70*, or *40 CFR §68.215*, or other Regulatory Codes sections. Instead, it should be a *de jure* Regulatory Agency duty to identify how a group of identified and validated defective, incomplete, or inaccurate *permit records*, as a whole, affects their entire Regulatory landscape. Petitioner also seeks Court concurrence on this item.

## [F-4d]: The Possibility of a *de minimis* Finding

Petitioner claims as long as any *common sense reading* of a particular *permit record* itself makes it self-evident that the *permit record* is defective, incomplete, or inaccurate, then researching and citing which portion of CAA, *40 CFR Part 68*, or *40 CFR Part 70* required these *permit records* to be generated in the first place,

18

is at most a *de minimis* imperfection against Petitioner's claims or Petitions, and should be nilpotent with respect to Agency adjudication of the validity of those allegations. If the Agency validates the Petitioner's allegations, the Agency can then mandate Refinery Operator step needed for proper curing of the validated defective, incomplete, or inaccurate *permit records*.

As noted above, a single validated defective, incomplete, or inaccurate *permit record* may impact many Refinery Operator physical systems and subsystems, and thereby touch many CAA, *40 CFR Part 70*, or *40 CFR §68.215* sections and subsections, as well as touching outside Agencies that may be relying on the presumption of accurate, complete, and non-defective *permit records*.

Thus, Petitioner further claims here that for the case of alleged defective, incomplete, or inaccurate *permit records*, the Administrator or any other Regulatory Agency can simply be directed to note Petitioner's omission of citing Regulatory Codes, as a *de minimis* Petition imperfection, with the Regulatory Agency proceeding to merits of the Petitioner's claims and concerns with respect to any alleged defective, incomplete, or inaccurate *permit records*.

**[F-5]:** PETITIONER REBUTTAL TO SPECIFIC AGENCY DENIAL GROUNDS

**[F-5(1)]:** On 4/5/2024, around when Petitioner first had access to the 693-page LAFD CUPA document, the SCAQMD issued their 19-page final response

19

*{Exhibit-09}* to Petitioner's *Exhibit-07* and *Exhibit-08* and other people's Public

Comments. The SCAQMD noted 'no Permit changes' were being made as a result

of those Public Comments. Of particular importance, in the SCAQMD denying all

Public Comment claims, is the SCAQMD assertion *{Exhibit-09, p. 3 of 19}*:

> *"The Refinery has a Comprehensive Risk Management Plan {RMP}."*

After this SCAQMD denial, when the 693-page LAFD CUPA document was made

available, Petitioner extracted 10 critical pages *{Exhibit-11}*, which allowed

Petitioner to develop the follow-on items **[G-2]** and **[G-3]** of **[Section G]** in the

present document. Petitioner claims here items **[G-2]** and **[G-3]** refute the above

SCAQMD *RMP* assertion, and so that the SCAQMD erred in that assertion.

**[F-5(2)]:** Petitioner rebuts Administrator **[F-3b(i)]** and **[F-3b(ii)]** as follows:

**[F-5(2)(a)]:** In the follow-on items **[G-2]** and **[G-3]** of this document, Petitioner

claims here that since virtually the entire *permit, permit process, and permit record*

derive from the CAA requirements, any defective, incomplete, or inaccurate *permit*

*records* already are a ***prima facie*** *noncompliances* of the Refinery Operator's CAA

or 40 CFR 70.6(a)(6)(i) requirements. Thus, Petitioner claims that identification of

defective, incomplete, or inaccurate *permit records* should have been sufficient

grounds for the Administrator to adjudicate Petitioner's claims regarding these

*noncompliances,* allowing the Administrator to mandate Permit Additions or

20

Modifications to cure these defects, and to help prevent future recurrences.

**[F-5(2)(b)]:** Petitioner claims since **NO** sections of the CAA, *40 CFR Part 68*, or *40 CFR Part 70*, allow the promulgation of defective, incomplete, or inaccurate *permit records* to any Agency receiving documents or reports; and that doing so by the Refinery Operator also constitutes a ***prima facie*** violations.

**[F-5(2)(c)]:** Petitioner further claims that as long as any *common sense reading* of a particular *permit record* itself makes it self-evident that the *permit record* is defective, incomplete, or inaccurate, then researching and citing which portion of CAA, *40 CFR Part 68*, or *40 CFR Part 70* required these *permit records* to be generated in the first place, is at most a *de minimis* imperfection against Petitioner's claims or Petitions.

**[F-5(2)(d)]:** As such, Petitioner also claims Administrator denial of Petitioner's Petition No. IX-2024-14 in its entirety, due to this *de minimis* imperfection, renders Administrator Petition denial as capricious and arbitrary, under CAA *§* 307(d)(9), and 42 USC 7607(d)(9).

**[F-5(2)(e)]:** Petitioner further claims that Permit Additions/Modifications are needed, to better ***assure compliance with*** already existing CAA or 40 CFR 70 requirements, including:

**[F-5(2)(e)(i)]:** Curing the items already identified from the Refinery Operator

21

having submitted defective, incomplete, or inaccurate *permit records* to Agencies;

**[F-5(2)(e)(ii)]:** Having further Permit Additions and/or Modifications to provide additional checks and balances to ensure the Refinery Operator does not submit future similarly defective, incomplete or inaccurate *permit records* to Agencies;

**[F-5(2)(e)(iii)]:** Having ERP additions and upgrades, vetted through the SCAQMD and US EPA, that properly addresses the possibility of a Category-4 Catastrophic HF/MHF Release Event that goes "Outside the Refinery", creating Off-Site Impacts, which should contain these mandatory components to minimize health impacts people and damage to the environment:

**[F-5(2)(e)(iii-a)]:** Requiring the Refinery Operator to maintain ongoing coordination with the SCAQMD, US EPA, and the outside Agencies of Police, Fire, Heath Authorities, and the Public, for responses to a Category-4 Catastrophic HF/MHF Release Event that goes "Outside the Refinery".

**[F-5(2)(e)(iii-b)]:** Requiring the Refinery Operator to maintain adequate pre-event insurance, monetary resources, and payment implementation plans, vetted by the SCAQMD and US EPA, for post-event mitigation of long-term health impacts from Category-4 Catastrophic HF/MHF Releases that goes "Outside the Refinery".

**[F-5(2)(e)(iii-c)]:** Requiring the Refinery Operator to develop and disseminate Catastrophic Event timelines for: (A) optimal, (B) less-optimal, and (C) sub-

22

optimal temporal responses, vetted by the SCAQMD and US EPA, that include human health impacts for (A), (B), and (C).

**[F-5(2)(f)]:** The Bhopal Gas Leak Disaster of 2-3 December 1984 killed more than 5000 people and injured an estimated 100,000, with many suffering long-term health issues. Union Carbide settled in 1989 through the India Supreme Court for $470M, but if Union Carbide settlement paralleled the US Asbestos settlement, its comparable amount could have exceeded $10B *{Exhibit-13}*. Petitioner claims that this Bhopal Gas Leak Disaster should be used by the SCAQMD and US EPA to assess the adequacy of future proposed Refinery Operator responses to a *'Category-4 Catastrophic HF/MHF Release with Off-Site Impacts'*.

**[F-5(3)]:** The Administrator also asserted: *"Petitioner seeks to use the title V permitting process to revise the terms of the facility's underlying RMP itself,"* which might be valid for some of Petitioner's original 16 claims in Petition IX-2024-14, but this *"revise the terms"* no longer applies to the main surviving claims, as given here in **[G-2]** and **[G-3]** of this *'Petition for Review'*, which seek only to: (a) cure defects found in ERM/ERP portions of the present-day Valero-Ultramar RMP; (b) cure defects found in the Refinery Operator *permit record*; and to (c) have Permit Additions and Modifications to correct these identified defects, to minimize their future occurrence or impacts.

23

## [Section G] ARGUMENTS, PART TWO

### Defective, Incomplete, and Inaccurate Permit Records

**[G-1]:** Part of the case Petitioner brings to the Court, is that Petitioner claims two major defects, incompletenesses, or inaccuracies, were found in the *permit record {Exhibit-11}* that: (a) need to be cured prior to the full granting of the Final Title-V Permit Renewal for the Valero-Ultramar HF Refinery in Wilmington, CA [SCAQMD Facility ID 800026]; with (b) additional Permit modifications warranted to prevent defect recurrence, and enhanced reporting to allow Agency curing of these types of defects in a more timely manner.

Both items (**[G-2]** and **[G-3]**, below) were highlighted in Petitioner's EAB Appeal *{Exhibit-04, 10/26/2024}*, and were important parts of Petition No. IX-2024-14 *{Exhibit-02, 7/15/2024}*, and the prior *Emergency Petition {Exhibit-10, 5/10/2024}* to the US EPA Region-9 Staff; with **[G-2]** relating to the Valero-Ultramar Emergency Response Manual [ERM] and Emergency Response Plans [ERP], as significant elements of their present-day overall Risk Management Plan [RMP]; while **[G-3]** relates to the Valero-Ultramar Refinery Operator submitting ***prime facie*** defective, incomplete, or inaccurate *permit records* to the LAFD (Los Angeles Fire Department) CUPA (Certified Unified Program Agency); with specific examples presented in **[G-4]**.

24

**[G-2]:** The first major item concerns the Valero-Ultramar ERM/ERP, which was provided on pp. 304-489 of the 693-page LAFD-CUPA document. It spans 186 pages, with Petitioner's *Exhibit-11*, on pp. 2-8, containing critical ERM/ERP extracts. The Valero-Ultramar ERM/ERP covers innocuous Category-1 through Catastrophic Category-4 events, where Petroleum Product and Corrosive Chemical Releases are treated separately, with HF/MHF Releases being the latter. The present-day ERM/ERP also has separate pages for Releases that go "Outside the Refinery" creating Off-Site Impacts versus those that might not go "Outside the Refinery". Among these various ERM/ERP possibilities, Petitioner claims that a '*Category-4 Catastrophic HF/MHF release with Off-Site Impacts*' qualifies as a *worst case accidental release* event.

**[G-2a]:** The major defect Petitioner then identified is that the ERM and ERP has pages covering virtually every other case, except for this case. The ERM and ERP is silent on '*Category-4 Catastrophic HF/MHF release with Off-Site Impacts*', which Petitioner claims is a serious omission, so that there presently is no ERM and ERM *"evaluation of a worst case accidental release"* for the case of a '*Category-4 Catastrophic HF/MHF release with Off-Site Impacts*'. Consequently, there is no Refinery Operator *"response program"* for this worst-case.

**[G-2b]:** Petitioner also claims here that these omissions qualify as serious

violations of the Clean Air Act (CAA) Sections 7412(r)(7)(B)(ii)(I) and 7412(r)(7)(B)(ii)(III); since 7412(r)(7)(B)(ii)(I) requires that the Risk Management Plan (RMP) "*shall include an evaluation of worst case accidental releases*", while 7412(r)(7)(B)(ii)(III) requires that the RMP contain "*a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.*"

**[G-2c]:** Petitioner claims these omissions, as CAA violations, make the Refinery Operator noncompliant to their *Permit*, and these omissions also make the Refinery Operator noncompliant to 40 CFR 70.6(a)(6)(i): "*The Permittee must comply with all conditions of the Part 70 permit. Any permit noncompliance constitutes a violation of the {Clean Air} Act, and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.*"

**[G-2d]:** Petitioner also claims here the Refinery Operator ERP (*Exhibit-11*, p. 5) for a *'Category-4 Catastrophic {Corrosive Chemical HF} Release'* without considering off-site impacts is also defective, as the ERP only lists has 6 items in its Table 2.2 (*Exhibit-11*, p. 6) as Representative Actions for this catastrophic case.

26

These are labeled here as *ERP_Item-1* through *ERP_Item-6*, with Petitioner

claiming that defects are present for each *ERP_Item*, which are noted for each.

*ERP_Item-1: "Activate the ERP and report emergency to Lead Process Technicians*

*[LPT]"*.  Petitioner claims [Item Defect-1] the ERP saying to "Activate ERP" is

self-referential and not actionable.  [Item Defect-2] Reporting to an LPT is also far

too low a level for handling a Category-4 Catastrophic HF Release.  There should

be a "911" button on every Refinery and Contractor Staff radio or Communication

Device that automatically ties in to the Refinery Operator Central Command and

Control Console (CCCC), and automatically ties into the LAFD 911 system.

*ERP_Item-2: "Check the MSDS information and know the chemicals in your*

*area."*  Petitioner Claims [Item Defect-3] every person routinely working in any

area with hazardous chemicals is supposed to 'know the chemicals' in their area

and where the MSDS (or SDS) binder is located.  Very few, and maybe only one

chemical, can create a Category-4 Catastrophic Corrosive Chemical release, so this

step, if followed, wastes time, where seconds count.

*ERP_Item-3: "Activate deluge systems if available and safe to do so without*

*protective equipment."*  Petitioner Claims [Item Defect-4] deluge systems for

major HF releases, including Water Cannons, Water Curtains, and HF/MHF

dumping into safe-tanks usually is activated from the CCCC.  The first person to

27

report an emergency is not likely to be CCCC Operator. That's why notifying the CCCC should be the proper *ERP_Item-1*. This *ERP_Item-3* then likely has the first person to report an emergency **do nothing** else, while notice of the emergency works its way from the LPT person noted in the present *ERP_Item-1*, up to the CCCC Operator, again wasting time, where seconds and minutes count.

ERP_Item-4: *"Activate fixed monitors to control release at its source if available and safe to do so without protective equipment."* Petitioner Claims [Item Defect-5] 'Fixed Monitors' measure things at a particular location. Some Monitors activate automatically when sensing an improper condition, like automatic sprinklers that create "Monitor Streams". Unfortunately, at room temperature and normal atmospheric pressure, an HF/MHF Release generates pure HF gas, which no 'Fixed Monitor' can control, aside from Deluge Systems for major HF/MHF releases, which usually is activated from the CCCC. This *ERP_Item-4* then likely has the first person to report an emergency **do nothing** else, while notice of the emergency works its way from the LPT person noted in the present *ERP_Item-1*, up to the CCCC Operator, again wasting time, where seconds and minutes count.

ERP_Item-5: *"Evacuate personnel from area."* Petitioner claims that the Refinery Operator is not likely to have anhydrous Hydrogen Fluoride [HF] gas in an on-site gas cylinder. The Refinery Operator may have small amounts of 'HF liquid' on

28

site, indicating Hydrofluoric Acid, which is a solution of Hydrogen Fluoride molecules in water, where localized spills can be cleaned up with Baking Soda (Sodium Bicarbonate). However, HF Releases from the Refinery Alkylation Unit or HF Settler Tanks associated with the Refinery Alkylation Unit are likely to form a toxic Ground-Hugging HF cloud, where a large release HF cloud can roll on for miles, and be lethal to humans within minutes of exposure. For small localized HF/MHF Releases, evacuating personnel may be proper. However, for massive HF/MHF releases that occur outside of where a person is located, the proper course of action for that person would likely be to 'Shelter-in-Place', as evacuation can expose personnel to the toxic HF cloud. Since this Table 2.2 is supposed to apply to a Category-4 Catastrophic HF/MHF Release, a 'Shelter-in-Place' instruction would more likely be the proper instruction.

*ERP_Item-6: "Isolate equipment at a safe distance .. Divert the release to a safe containment area or continue dilution of the release using monitor streams."* Petitioner claims [Item Defect-7] that isolating equipment by an individual likely applies only to small or localized HF/MHF releases. For major HF/MHF releases, isolating equipment likely needs to be done from the CCCC. Diverting the HF/MHF release is impossible because HF gas emerges from even localized releases. For small to medium-sized HF/MHF releases, dilution of the release is

29

also impossible without having a local deluge water system, which would have to be wired in locally to be quickly activated, after which the person should immediately leave, shutting the door behind them. The '*Continue Dilution*' instruction is totally inappropriate for even small HF/MHF releases, as it exposes the person to ongoing HF gas, which can result in a lethal exposure.

**[G-2e]:** Petitioner claims the above identified defects demonstrates the SCAQMD erred in their assertion *{Exhibit-09, p. 3 of 19}* that:

> *"The Refinery has a Comprehensive Risk Management Plan {RMP}."*

**[G-2f]:** Petitioner further claims that the present-day *permit, permit process, and permit record*, which was allowed to go forward with these Refinery Operator defects omissions in place, constitute grounds for modification of the present-day Valero-Ultramar Final Title-V Permit Renewal, with additional Permit terms and conditions added requiring the Refinery Operator to cure these omissions, and have them vetted as adequate by the SCAQMD, US EPA, and Public, to help prevent future recurrence. Petitioner seeks Court concurrence for Permit modifications and additions, to cure these defects and omissions, as outlined in **[Section H]**.

**[G-3]:** The second major item Petitioner identified is the Valero-Ultramar Refinery Operator submitted ***prime facie*** defective, incomplete, or inaccurate *permit records* to the LAFD-CUPA, which oversees six California State Programs: California

Accidental Release Prevention [CalARP], Hazardous Materials Management Plans [HMMP] and {Hazardous Materials} Inventory Statements [HMIS], Above-ground Petroleum Storage Act [APSA], Underground Storage Tank [UST], Hazardous Materials Business Plan [HMBP], and Hazardous Waste Generator and Onsite Treatment [HWGOT], thereby impacting multiple programs.

Petitioner claims here that Refinery Operator submission of defective, incomplete, or inaccurate *permit records* to any Agency constitutes a violation of Section K-25 of the Final Title-V Renewal Permit and/or CFR §68.215; depending on: (a) if similar defective, incomplete, or inaccurate *permit records* were also submitted to the SCAQMD or US EPA, or (b) if the SCAQMD or US EPA created similar defective, incomplete, or inaccurate *permit records* by accessing or copying *permit records* from the LAFD CUPA, or from the 6 Programs the CUPA oversees.

Section K-25 of the Final Title-V (p. 1339 of 1369) states: *"All records, reports, and documents required to be submitted by a Title V operator to AQMD or EPA shall contain a Certification of Accuracy consistent with Rule 3003(c)(7) by a responsible official (as defined in Rule 3000). [3004(a)(12)]"*

Similarly, CFR §68.215 requires *40 CFR Part 70* or *40 CFR Part 71* Stationary Source Operators, which includes all Refinery Operators, to submit a "Source Certification", which is: *"... a Certification Statement that the {Stationary} Source*

31

*is in compliance with all requirements of this part, including the registration and*

*submission of the RMP {Risk Management Plan}.*" [40 CFR §68.215(a)(ii)].

When the Refinery Operator submits *permit records* to Agencies besides the

AQMD or US EPA, where a Certification of Accuracy is not required to be

concurrently submitted, Petitioner claims here those Refinery Operator *permit*

*records* are still required be complete, accurate, and non-defective. As a check,

Petitioner queried the Google(R) AI Chatbot: *"Can a 40 CFR Part 70 Facility*

*submit inaccurate information to other agencies?",* which responded:

*"No, a 40 CFR Part 70 facility cannot submit inaccurate data to other agencies, as*

*doing so would be considered a violation of environmental regulations and could*

*result in significant penalties, including fines and potential legal action due to the*

*requirement to submit truthful and accurate data."*

As a result, Petitioner claims here that Refinery Operator submission of defective,

incomplete, or inaccurate *permit records* to the LAFD CUPA makes the Refinery

Operator noncompliant to 40 CFR 70.6(a)(6)(i), and modification of the Valero-

Ultramar Final Title-V Permit Renewal is needed to enable proper curing, with

additional Permit terms and conditions added that requires the Refinery to cure

these *permit records,* and have them vetted as adequate by the SCAQMD, US EPA,

and Public, to help prevent future recurrence. As such, Petitioner seeks Court

concurrence for Permit modifications and additions, to better ensure Refinery

Operator submitted *permit records* are accurate, complete, and non-defective, as

given in the follow-on **[Section H]** 'Proposed Remedies'.

**[G-4]:** Specific Examples of *prime facie* defective, incomplete, or inaccurate

*permit records* submitted by the Refinery Operator to the LAFD-CUPA are

presented herein. The Valero-Ultramar Hazardous Materials Business Plan

[HMBP] and 55-page Hazardous Materials Inventory Statements [HMIS], were

provided on pp. 230-293 of the 693-page LAFD-CUPA document. Petitioner's

*Exhibit-11*, on pp. 9-10, contains critical representative HMIS extracts.

Petitioner claims that the Valero-Ultramar 55-page "*Hazardous Materials System*

*BP-8 Computer Listing of Inventory Submitted*" released as part of HMIS

compliance, and abstracted in *Exhibit-11*, contains multiple *prima facie* defective,

incomplete, or inaccurate *permit records*, making them noncompliant to any and all

CAA, *40 CFR Part 68*, or *40 CFR Part 70* sections that mandate Refinery

Operator recordkeeping that is complete, accurate, and non-defective.

The present SCAQMD *Facility Permit to Operate for Ultramar, Inc.* is Rev. #149,

5/28/2024, with SCAQMD records easily available back to Revision #38, dated

9/28/2004. Given that Title-V Permits require Permit Renewals every 5 years,

Petitioner would have expected Permit Renewals in 2019, 2014, 2009.

33

**[G-4a]:** Petitioner claims the **First Record Defect** found in this 55-page *permit record* is that it has a *"Printed on: 7/28/2011"* timestamp. Therefore, this *permit record* seriously outdated, making it a ***prima facie*** defect. Petitioner finds it incredulous that the Refinery Operator has not added at least one new Chemical Inventory item in the last 13+ years, or has not increased the 'Maximum Quantity on Hand' for at least one chemical in this 55-page *permit record;* and that this defect was allowed by all Agencies to persist, after the circa 2014 Permit Renewal, after the circa 2019 Permit Renewal, and now into the Revision #149, 28 May 2024 Permit Renewal. Petitioner claims that additional Permit modifications are needed to cure this defect, and to prevent future recurrences.

**[G-4b]:** Petitioner claims the **Second Record Defect** found in this 55-page *permit record* is that while many chemicals are properly listed using either standard units of volume (e.g. gallons or cubic feet), or standard units of weight (e.g. pound or tons); and while one gallon is the same volume for each chemical using that unit, and one pound is the same weight for each chemical where that unit is used; many entries in this 55-page *permit record* are denominated in a unit of weight or volume listed as 'OTHERS'. Allowing use of that nonstandard unit of 'OTHERS' is by itself a ***prima facie*** defect. Furthermore, is 1 unit of 'OTHERS' for a particular chemical the same as 1 unit of 'OTHERS' for another chemical?

34

This 55-page *permit record* is given here in *{Exhibit-14}*. It contains about 301 entries using standard units, while having about 65 entries using the unit 'OTHERS'. With 65 such entries, Petitioner claims it is beyond reasonable doubt that 1 unit of 'OTHERS' has varied the among different chemicals within this 55-page *permit record*. As such, each variance constitutes a separate ***prima facie*** defect by itself, thereby creating multiple inaccuracies throughout this entire 55-page *permit record*. Petitioner claims that additional Permit modifications are needed to cure these defects, and to prevent future recurrences.

**[G-4c]:** Petitioner claims the **Third Record Defect** found in this 55-page *permit record* was even if the chemical was properly listed using either standard units of volume (e.g. gallons or cubic feet), or standard units of weight (e.g. pound or tons); the 'Maximum Quantity on Hand' for at least 15 of the about 366 total entries is [blank]. Each [blank] entry creates variance by itself, and each one constitutes a separate ***prima facie*** defect, compared to a pristine *permit record*; thereby creating additional multiple inaccuracies throughout the entire 55-page *permit record*. Petitioner claims that additional Permit modifications are needed to cure these defects, and to prevent future recurrences.

**[G-4d]:** Petitioner also claims a **Fourth Record Defect**; an interaction between these **[G-4c]** defects, and the prior subsection **[G-2]** defects; namely that on p. 26

35

of this 55-page *permit record*, the '*Hydrogen Fluoride, Anhydrous*' maximum amount in pounds is one of the [blank] entries. Thus, not only is there no ERM and ERM *"evaluation of a worst case accidental release"* for a '*Category-4 Catastrophic HF/MHF release with Off-Site Impacts*', and no Refinery Operator *"response program"* for this case; there is not even a Refinery 'Maximum Quantity on Hand' listed. Thus, all Agencies, including Police, Fire, and Health authorities will be blindsided in a '*Category-4 Catastrophic HF/MHF release with Off-Site Impacts*', since '*Off-Site*' is necessarily "Outside the Refinery". Petitioner claims special Permit additions and modifications are needed to cure this severe defect. Petitioner claims this **Fourth Record Defect** demonstrates the SCAQMD further erred in their assertion:

*"The Refinery has a Comprehensive Risk Management Plan {RMP}."*

*{Exhibit-09, p. 3 of 19}*, which Petitioner believes was a major SCAQMD rationale for dismissing Petitioner's 9/2023 initial Public Comment claims and concerns. Petitioner therefore prays that the U.S. Court of Appeals mandate Permit additions and modifications to the Valero-Ultramar Title-V Permit Renewal to the fullest extent possible, to mitigate the catastrophic health and environmental impacts of a '*Category-4 Catastrophic HF/MHF release with Off-Site Impacts*'.

36

## [Section H]  PROPOSED REMEDIES

**[H-1]:** Petitioner claims that identified defects, especially in the *permit record*, (a) Need to be cured prior to the full granting of the Final Title-V Permit Renewal for the Valero-Ultramar HF Refinery in Wilmington, CA; and that (b) Permit Additions or Modifications are needed to prevent defect recurrence, with enhanced reporting to allow agencies to effect curing of these inaccuracies in a more timely manner.

**[H-2]:** Petitioner reiterates here his Petition No. IX-2024-14 claim *{Exhibit-02, p.11, pp. 18-19}* that Permit Additions or Modifications are needed, beyond this present-day *F24.1(a)* requirement:

*F24.1(a): The Operator shall comply with the accidental release prevention requirements pursuant to 40 CFR Part 68 .. including the registration and submission of a Risk Management Plan (RMP).*

To effect the needed changes Petitioner asks the Court to concur with the following Permit Additions and Modifications to the present-day Valero Ultramar Wilmington HF Refinery 2024 Title-V Permit Renewal.  These needed Permit changes were detailed in Petitioner's July 15, 2024 Petition No. IX-2024-14 (p. 11-of-33), with corrections and clarifications here noted using {*} symbols.

*F24.1(b): The Refinery Facility Operator as part of their RMP, shall maintain and*

37

*upgrade their Refinery Facility Emergency Response Manual [ERM] and Emergency Response Plans\* [ERP] for Corrosive Chemical Releases, up through and including Category-4 Catastrophic HF/MHF Releases with Off-Site Impacts.*

***F24.1(b)(i):*** *The ERP shall include updates to the Refinery Operator Chemical Inventory (CI) list, which shall be released yearly to the Los Angeles Fire Department (LAFD) Certified Unified Program Agency (CUPA), and SCAQMD for Public Release.*

***F24.1(b)(i)(A):*** *Quantity amounts shall be in either Standard International (SI) Units (such as kilograms and liters), or British Units (such as pound and gallons).*

***F24.1(b)(i)(B):*** *Any missing or erroneous CI entries shall be corrected by the Refinery Operator in a timely manner, with a CI update released.*

***F24.1(c):*** *All ERM and ERP changes and upgrades shall be vetted through the SCAQMD and US EPA\*\*, and shall include:*

***F24.1(c)(1):*** *Enhanced Guidance for all Refinery on-site personnel covering the case of a Catastrophic Category 4 HF/MHF release scenario with Off-Site Impacts, and make it available to all Refinery on-site personnel;*

***F24.1(c)(2):*** *Enhanced Guidance on what pre-coordination with outside agencies should be done, prior to a Catastrophic Category 4 HF/MHF release with Off-Site Impacts;*

38

*F24.1(c)(3): Enhanced Guidance on what coordination with outside agencies should be done, during a Category 4 Catastrophic HF release scenario with Off-Site Impacts, and what response time-scales are needed to minimize human injury and/or loss of life.*

*F24.1(c)(4): The Enhanced Guidance for F24.1(c)(1) through F24.1(c)(3) shall be developed with a time-scale resolution of no coarser than a 10 second interval, and cover a period no smaller than 20 minutes.*

*F24.1(d)\*\*\*: While a Category-4 Catastrophic HF/MHF Release with Off-Site Impacts may be unlikely, its economic and human and medical impact can be vast, so that additional financial security needs to be provided to the pubic-at-large in case of such an event. Therefore, as part of the Refinery Operator Emergency Response Plans [ERP]\*\*\*\*, for continued use of HF/MHF Alkylation, the Refinery Operator shall post a $1 billion Surety Bond with the City of Los Angeles, using an independent insurer vetted by the City of Los Angeles as capable of paying for human, medical, and property damages, in the event of such a scenario occurring, in order to mitigate the short-term and long-term Public Health and Safety effects of a Refinery Operator Category-4 Catastrophic HF/MHF release with Off-Site Impacts.*

*F24.1(e): Because Category 4 Catastrophic HF/MHF releases with Off-Site*

39

*Impacts constitute an extreme Public Health and Safety Emergency, all Refinery Operator proposed: [1] ERM and ERP upgrades, and [2] Enhanced Guidance documents [F24.1(c)(2)-F24.1(c)(4)] shall be made available to the Public through the SCAQMD for Public Comments, after all Refinery Operator proprietary or confidential information is redacted out; with the SCAQMD then generating or concurring on the final upgraded ERMs, ERPs, and final Enhanced Guidance documents, prior to implementation.\*\*\*\*\**

***F24.1(f):*** *{Present-day Final Title-V F24.1(b) paragraph.}*

 \* *Note_1a:* Petitioner's concerns about the significant impacts of a *Category-4 Catastrophic HF/MHF Release*, and the lack of substantial and specific guidance in the Refinery Operator RMP for a *Category-4 Catastrophic HF/MHF* Release, covering Release effects within the Refinery, as well as those that could occur "Outside the Refinery", were originally highlighted as *F24.1(b)* on p. 11-of-29 of Petitioner's prior May 10, 2024 *Emergency Petition* to the US EPA Region-9 Staff, entitled: *"Emergency Petition to the US EPA for Timely and Needed Additions and Modifications to the Proposed Title V Permit Renewal for the Valero Ultramar HF Refinery."* *{Exhibit-10}*

\* *Note_1b:* The phrase *'and Emergency Response Plans [ERP]'* is added here for clarity and consistency.

** *Note_2a:* The additional phrase: *'shall be vetted through the SCAQMD and US EPA'* was added here, to ensure the correctness and technical accuracy of ERM and ERP upgrades.

** *Note_2b:* These *F24.1(c)(1) – (c)(4)* mirror *F24.1(e)(1) – (e)(4)* in Petition No. IX-2024-14.

*** *Note_3a:* The proposed Surety Bond was originally highlighted as *F24.1(c)* on p. 11-of-29 of Petitioner's prior May 10, 2024 *Emergency Petition* to the US EPA Region-9 Staff, entitled: *"Emergency Petition to the US EPA for Timely and Needed Additions and Modifications to the Proposed Title V Permit Renewal for the Valero Ultramar HF Refinery." {Exhibit-10}.* Presently, the Refinery Operator had only a $1M of General Commercial Liability Insurance per occurrence, through Ace American Insurance Company, which also actually expired on 5/1/2018 *{Exhibit-11, p. 2 of 10}.*

*** *Note_3b:* Petition No. IX-2024-14 text claiming Valero-Ultramar was an LLC was removed.

**** *Note_4:* The association of the proposed Surety Bond as a component of the Refinery Operator Emergency Response Plan [ERP] is added here for clarity.

***** *Note_5:* This *F24.1(e)* clarifies and simplifies *E12 – E17* from Petition No. IX-2024-14.

41

## [Section I] CONCLUSIONS

In the present *'Petition for Review'* to the US Court of Appeals, Petitioner claims that the above information establishes Petitioner's standing to bring these concerns to the US Court of Appeals, with regards to the present-day Final Title-V Permit Renewal for the Valero-Ultramar HF Refinery in Wilmington, CA [SCAQMD Facility ID 800026], which includes these specific Petitioner Claims:

**[I-1]:** That 3 potential faults were found in the US EPA Administrator denial of Petitioner's Petition IX-2024-14 that involve questions of Law, as covered in the above **[Section F]**; and that:

**[I-2]:** That two major defects in the *permit record {Exhibit-11}* were also identified that: (a) need to be cured prior to the full granting of the Final Title-V Permit Renewal for the Valero-Ultramar HF Refinery, as given in the above **[Section G]**; with (b) additional Permit modifications warranted to prevent defect recurrence, and enhanced reporting allowing agencies to cure of these types of defects in a more timely manner, as given in the above **[Section H]**.

## [Section J] CERTIFICATE OF COMPLIANCE

Electronic Word Count for Document: 9432 Words

42

**[Section K] CERTIFICATE OF SERVICE TO INTERESTED PARTIES**



# SELECTED EXHIBITS
## Associated with:

**PETITON FOR REVIEW OF
US EPA ADMINISTRATOR
OCT. 4, 2024**

**"ORDER DENYING A PETITION
FOR OBJECTING TO A
TITLE V OPERATING PERMIT"**

**Re: Petition No. IX-2024-14**
Submitted by: Dr. Genghmun Eng

**EXHIBITS INCLUDED:**
*Exhibit-01*
*Exhibit-03*
*Exhibit-04*
*Exhibit-05*
*Exhibit-07*
*Exhibit-08*
*Exhibit-11*

*{Exhibit-01}*

[10/4/2024]

US EPA Administrator Denial of Petition IX-2024-15 in its

Entirety.

**BEFORE THE ADMINISTRATOR**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

---

Petition No. IX-2024-14

In the Matter of

Ultramar Inc.

Permit Renewal for Facility ID 800026

Issued by the South Coast Air Quality Management District

---

**ORDER DENYING A PETITION FOR OBJECTION TO A TITLE V OPERATING PERMIT**

## I.  INTRODUCTION

The U.S. Environmental Protection Agency (EPA) received a petition dated July 13, 2024 (the Petition) from Genghmun Eng (the Petitioner), pursuant to section 505(b)(2) of the Clean Air Act (CAA or Act), 42 United States Code (U.S.C.) § 7661d(b)(2). The Petition requests that the EPA Administrator object to the renewal of the operating permit (Permit) issued by the South Coast Air Quality Management District (SCAQMD) to the Ultramar Inc. refinery in Los Angeles County, California (Facility ID 800026). The Permit was issued pursuant to title V of the CAA, 42 U.S.C. §§ 7661–7661f, and SCAQMD Regulation XXX. *See also* 40 Code of Federal Regulations (C.F.R.) part 70 (title V implementing regulations). This type of operating permit is also known as a title V permit or part 70 permit.

Based on a review of the Petition and other relevant materials, including the Permit, the permit record, and relevant statutory and regulatory authorities, and as explained in Section IV of this Order, the EPA denies the Petition requesting that the EPA Administrator object to the Permit.

## II.  SUMMARY OF STATUTORY AND REGULATORY FRAMEWORK

All major stationary sources of air pollution and certain other sources are required to apply for and operate in accordance with title V operating permits. One purpose of the title V program is to "enable the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements." 57 Fed. Reg. 32250, 32251 (July 21, 1992). Title V permits include emission limitations and other conditions as necessary to assure compliance with applicable requirements of the CAA, including the requirements of the applicable implementation plan. 42 U.S.C. §§ 7661a(a), 7661b, 7661c(a). The title V operating permit program generally does not impose new substantive air quality control requirements, but does require permits to contain adequate monitoring, recordkeeping, reporting, and other requirements to assure compliance with applicable requirements of the CAA. 40 C.F.R. § 70.1(b); 42 U.S.C. § 7661c(c).

1

State and local permitting authorities, including SCAQMD, issue title V permits pursuant to their EPA-approved title V programs. EPA granted full approval of SCAQMD's title V program in 2001. 66 Fed. Reg. 63503 (December 7, 2001). SCAQMD's title V program is codified in SCAQMD Regulation XXX.

State and local permitting authorities are required to submit each proposed title V operating permit to the EPA for review. 42 U.S.C. § 7661d(a); 40 C.F.R. § 70.8(a). Upon receipt of a proposed permit, the EPA has 45 days to object to issuance of the permit if the EPA determines that the proposed permit is not in compliance with applicable requirements of the CAA. 42 U.S.C. § 7661d(b)(1); *see also* 40 C.F.R. § 70.8(c). If the EPA does not object to a permit on its own initiative, any person may, within 60 days of the expiration of the EPA's 45-day review period, petition the Administrator to object to the permit. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(d).

A title V petition is a type of formal legal challenge—an administrative appeal of a permit issued by the state or local permitting authority. As such, petitions asking EPA to object to a title V operating permit are subject to various constraints and requirements imposed by Congress and the EPA. *See* 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12, 70.13, 70.14.

For example, each petition must identify the proposed permit on which the petition is based and identify the petition claims. 40 C.F.R. § 70.12(a). Any arguments or claims the petitioner wishes the EPA to consider in support of each issue raised must generally be contained within the body of the petition. 40 C.F.R. § 70.12(a)(2).[1] In general (unless an exception applies), each petition claim must be based on an issue that was raised with reasonable specificity during the public comment period provided by the permitting authority. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(d); *see also* 40 C.F.R. § 70.12(a)(2)(v).

Importantly, any issue raised in the petition as grounds for an objection must be based on a claim that the permit, permit record, or permit process is not in compliance with applicable requirements of the CAA or requirements under the EPA's part 70 rules. 40 C.F.R. § 70.12(a)(2); *see* 42 U.S.C. § 7661d(b)(2). The EPA's regulations further identify the types of requirements that qualify as "applicable requirements" of the CAA. Applicable requirements include a variety of EPA regulations that are based on the CAA, as well as certain EPA-approved state or local regulations that are based on the CAA. *See* 40 C.F.R. § 70.2 (definition of "applicable requirement"). The EPA cannot object to a title V permit based on petition claims that do not involve a CAA-based requirement. The EPA acknowledges that the title V permitting program and the title V petition opportunity may not be able to address all environmental issues that may be of concern to a community.

The CAA provides that the EPA Administrator must issue an objection if a petitioner demonstrates that a permit is not in compliance with the requirements of the CAA. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(c)(1). Congress placed the burden on the petitioner to make the required demonstration to the EPA. The EPA's regulations specify requirements that a petitioner must include in a petition to satisfy this demonstration burden. *See* 40 C.F.R. § 70.12(a). For example, the petitioner must identify the specific grounds for an objection, citing to a specific permit term or condition where applicable. The

---

[1] If reference is made to an attached document, the body of the petition must provide a specific citation to the referenced information, along with a description of how that information supports the claim. In determining whether to object, the Administrator will not consider arguments, assertions, claims, or other information incorporated into the petition by reference. *Id.*

petitioner must also identify the applicable requirement of the CAA or the relevant regulation that is not met. The petitioner must also explain why the permit term or permit process is not adequate to comply with the corresponding CAA or regulatory requirement. 40 C.F.R. § 70.12(a)(2)(i)–(iii). General and conclusory petition claims, presented without sufficient citations or analysis, usually do not meet this requirement. The petitioner is also expected to address the permitting authority's reasoning behind the permitting decision when such information is available during the timeframe for filing the petition. 40 C.F.R. § 70.12(a)(2)(vi). Overall, the petitioner's demonstration burden is a critical component of the title V petition process under CAA § 505(b)(2).

A more detailed discussion about what a petitioner must provide, including court cases that address these principles, can be found in the preamble to EPA's proposed petitions rule. *See* 81 Fed. Reg. 57822, 57829–31 (August 24, 2016). Examples of prior title V petitions and EPA responses may be found at *https://www.epa.gov/title-v-operating-permits/title-v-petition-database*.

## III.    BACKGROUND

### A.    The Ultramar Facility

Ultramar, Inc., a subsidiary of Valero Energy Company, operates a petroleum refinery in Wilmington, Los Angeles County, California. The Ultramar refinery processes crude oil into various petroleum products such as gasoline, diesel, jet fuel, fuel oil, liquefied petroleum gases, and coke. The facility includes various processes and emission points, including atmospheric crude and vacuum distillation units, a fluid catalytic cracking unit, an isomerization unit, reforming units, an alkylation unit, and hydrotreating, blending, and coking, and other operations. The facility is a major source under title V and is subject to a variety of other regulatory programs under federal, state, and local laws.

### B.    Permitting History

The refinery has been in operation since 1969. Ultramar Inc. first obtained a title V permit for the facility in 2009, which was last renewed in 2015. On September 26, 2019, Ultramar applied for a title V permit renewal. SCAQMD published notice of a draft permit on August 23, 2023, subject to a public comment period that ran until September 26, 2023. On April 5, 2024, SCAQMD submitted the Proposed Permit, along with its responses to public comments (RTC), to the EPA for its 45-day review. The EPA's 45-day review period ended on May 20, 2024, during which time the EPA did not object to the Proposed Permit. SCAQMD issued the final title V renewal permit for the Ultramar refinery on May 28, 2024.

### C.    Timeliness of Petition

Pursuant to the CAA, if the EPA does not object to a proposed permit during its 45-day review period, any person may petition the Administrator within 60 days after the expiration of the 45-day review period to object. 42 U.S.C § 7661d(b)(2). The EPA's 45-day review period expired on May 20, 2024. The EPA's website indicated that any petition seeking the EPA's objection to the Permit was due on or before July 18, 2024. The Petition was dated July 13, 2024. Therefore, the EPA finds that the Petitioner timely filed the Petition.

### D. Environmental Justice

The EPA used EJScreen[2] to review key demographic and environmental indicators within a five-kilometer radius of the Ultramar refinery. This review showed a total population of approximately 191,368 residents within a five-kilometer radius of the facility, of which approximately 89 percent are people of color and 44 percent are low income. In addition, the EPA reviewed the EJScreen Environmental Justice Indexes, which combine certain demographic indicators with 13 environmental indicators. The following table identifies the Environmental Justice Indexes for the five-kilometer radius surrounding the facility and their associated percentiles when compared to the rest of the State of California.

| EJ Index | Percentile in State |
|---|---|
| Particulate Matter 2.5 | 83 |
| Ozone | 62 |
| Nitrogen Dioxide | 93 |
| Diesel Particulate Matter | 88 |
| Toxic Releases to Air | 95 |
| Traffic Proximity | 84 |
| Lead Paint | 85 |
| Superfund Proximity | 87 |
| RMP Facility Proximity | 94 |
| Hazardous Waste Proximity | 94 |
| Underground Storage Tanks | 86 |
| Wastewater Discharge | 92 |
| Drinking Water Non-Compliance | 95 |

## IV. EPA DETERMINATIONS ON PETITION CLAIMS

The Petition includes 17 separately numbered "Claims." Some of these "claims" (Claims 1 and 2) do not specifically discuss flaws in the Permit, but instead contain background discussion. Many of the claims (such as Claims 5, 6, 7, 8, 10, 11, 12, 13, 14, and 16) raise overlapping issues, and the EPA's responses below responds to those claims collectively.[3] Other claims (Claims 3, 4, 9, 15, and 17) raise distinct issues, and the EPA's responses below respond to those claims individually.

---

[2] EJScreen is an environmental justice mapping and screening tool that provides the EPA with a nationally consistent dataset and approach for combining environmental and demographic indicators. *See https://www.epa.gov/ejscreen/what-ejscreen*. The information herein is based on an August 21, 2024, report using EJScreen version 2.3.

[3] In a preliminary section of the Petition titled "Abstract," the Petitioner alleges that the facility provided documents to SCAQMD that were "non-compliant," "incomplete," or "deliberately misleading." Petition at 2. To the extent the Petitioner identified specific issues, this Order responds to those in the claim-specific discussion below. Regarding the broad, overarching allegation that certain documents are misleading, the Petitioner fails to demonstrate that any documents provided to SCAQMD did not comply with any applicable requirements of the CAA.

**A.     Claims 1 and 2, titled "Applicability of 40 CFR_Part-63 _ubpart-UUU and 40 CFR_Part-68" and "Applicability of US President Executive Order 13985"**

*Petition Claims:* In what the Petitioner labels "Claim_01," the Petitioner recounts prior correspondence from EPA Region 9 to the Petitioner. There, the EPA explained that if the Petitioner wished to file a title V petition, "any issue raised in the petition as grounds for an objection must be on a claim that the permit, permit record, or permit process is not in compliance with the applicable requirements of the CAA or the regulations in 40 C.F.R. part 70." Petition at 5 (quoting Petition Doc-02). The Petitioner asserts that EPA Region 9 Staff erred in narrowing the applicable requirements to only the CAA or 40 C.F.R. part 70. *Id.* The Petitioner claims that the Permit must also require adherence to other parts of the C.F.R., such as part 63 subpart UUU and part 68. *Id.* The Petitioner then requests changes to the Permit, especially with respect to subpart UUU, "as detailed here in further Claims." *Id.* Later, within Claim 2, the Petitioner again cross-references its discussion about the applicability of subpart UUU to the refinery's Alkylation and Isomerization Unit, which the Petitioner indicates is discussed further in Claim 9. *Id.*

In what the Petitioner labels "Claim_02," the Petitioner states that Presidential Executive Order 13985, titled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," contains the following statement: "The Federal Government should, consistent with applicable law, allocate resources to address the historic failure to invest sufficiently, justly, and equally in Underserved Communities, as well as individuals from those communities." Petition at 5 (quoting EO 13985, Section 6). The Petitioner further asserts that the community near the Ultramar refinery is an underserved community. *Id.* The Petitioner claims that EO 13985 requires that EPA provide special consideration, above and beyond the requirements of the CAA and 40 C.F.R. part 70. *Id.* at 5–6. The Petitioner specifically requests changes to the Permit "that help to enhance and further protect human health and safety in the Underserved Community of Wilmington, CA." *Id.* at 6. The Petitioner then references Claim 3 for more information about this request.

*EPA Response:* To the extent Claim 1 or Claim 2 could be considered claims requesting the EPA's objection to the Permit, they are denied. These "claims" do not identify any alleged problems with the Permit or any other specific basis for the EPA's objection. 40 C.F.R. § 70.12(a)(2)(i). Instead, these "claims" primarily present background information and cross-reference more substantive discussion contained in other Petition claims. To the extent other Petition claims address issues related to EO 13985, 40 C.F.R. part 68, or 40 C.F.R. part 63, subpart UUU, the EPA is separately responding to those other claims.

To provide context for the EPA's response to those other Petition claims, the EPA will address the Petitioner's apparent disagreement with previous statements by EPA Region 9. After summarizing the procedures that the Petitioner could follow if he wished to submit a Petition, EPA Region 9 explained:

> Before submitting a petition, we encourage you to review 40 CFR 70.12 for the public petition requirements. Additionally, citizen petitions have special rules, which are contained in Clean Air Act Section 505(b)(2) and EPA's regulations at 40 CFR sections 70.8(d), 70.12, and 70.14. Among other requirements, any issue raised in the petition as grounds for an objection must be based on a claim that the permit, permit record, or permit process is not in compliance with applicable requirements of the Clean Air Act or

the regulations in 40 CFR part 70. Please note that we cannot object to a permit based on concerns about health and safety that are not related to a Clean Air Act requirement. EPA's rules can be found at *https://www.ecfr.gov/current/title-40/chapter-I/subchapter-C/part-70.*

Letter from Air Permits Section, EPA Region 9, to Genghmun Eng (June 18, 2024) (included as Petition Doc-02). The Region's statements were correct. The discussion in this letter that the Petitioner disagrees with comes directly from the EPA's nationally applicable regulations (which the Region identified and recommended that the Petitioner review prior to submitting this Petition). *See* 40 C.F.R. § 70.12(a)(2).

The Petitioner's disagreement with these prior EPA statements seems to be based on a misunderstanding about the phrase "applicable requirements of the CAA." It appears that the Petitioner interprets that phrase to narrowly include only requirements that are contained within the CAA itself (*i.e.*, the statute passed by Congress). However, this phrase is defined to include not only requirements that are contained within the CAA itself, but also requirements in certain regulations *that are based on the CAA.* Specifically, applicable requirements may be contained either within certain EPA regulations or within certain state or local regulations that are approved by the EPA (*e.g.*, in an EPA-approved State Implementation Plan, or SIP). *See* 40 C.F.R. § 70.2 (definition of "applicable requirement").[4] For additional background about the types of requirements that are—and are not—considered "applicable requirements" for purposes of title V permitting, see the discussion in 89 Fed. Reg. 1150, 1152–59 (Jan. 9, 2024).[5]

The EPA also notes that SCAQMD explained this concept when responding to public comments on the Draft Permit. Specifically, the District explained:

> The Title V permit identifies all the air quality requirements that apply to a facility in one document. These air quality requirements are known as "applicable requirements" and can come from South Coast AQMD, state, or federal regulations. Each Title V permit issued by the South Coast AQMD is required to include the permit content listed in South Coast AQMD Rule 3004. South Coast AQMD Rule 3004(a)(1) specifies the permit list the "Emissions limitations and those operational requirements that assure compliance with all regulatory requirements at the time of permit issuance." Therefore, Title V allows the South Coast AQMD to add new monitoring, recordkeeping, or reporting requirements, so as to determine whether the facility is complying with applicable air quality emission limitations and requirements. Title V, however, is not intended to go beyond applicable air quality rules and regulations. The Title V permit cannot include requirements outside of South Coast AQMD, state, or federal air quality regulations.

---

[4] Only those state and local rules that are based on the CAA and are approved by the EPA into a SIP reflect federally enforceable "applicable requirements" of the CAA. Additional information about SCAQMD regulations that are approved into the SIP can be found at *https://www.epa.gov/air-quality-implementation-plans/epa-approved-south-coast-air-district-regulations-california-sip.* As discussed elsewhere in this Order, state and local regulations that are not based on the CAA and are not approved by the EPA are not "applicable requirements."

[5] The cited **Federal Register** document can be accessed at *https://www.federalregister.gov/documents/2024/01/09/2023-27759/clarifying-the-scope-of-applicable-requirements-under-state-operating-permit-programs-and-the.*

RTC at 1. The EPA's response to other Petition claims will address this concept in more detail, to the extent it is relevant to those other Petition claims. Because these claims do not allege specific flaws in the Permit or, to the extent they do, those allegations are covered in other claims, the EPA denies Claims 1 and 2.

**B.     Claim 3: The Petitioner Claims That "EO-13985 Requires Better Adjudication of HF/MHF Risks."**

*Petition Claim:* The Petitioner expresses concern with what he considers one of the largest public health and safety concerns at the Ultramar refinery: the possibility of an accidental catastrophic release of anhydrous hydrogen fluoride (HF) and/or modified hydrofluoric acid (MHF) from the Alkylation and Isomerization Unit or other refinery components or storage units. Petition at 6. The Petitioner presents extensive discussion about the manner by which HF or MHF could be released and the consequence of such a release. *See id.* at 6–9.

The Petitioner claims that the Permit should include new provisions to address these concerns in order to comply with EO 13985. *Id.* at 9. Specifically, the Petitioner requests permit terms that provide alternatives to using HF/MHF in the refinery's alkylation process (in other words, to phase out HF and MHF). *Id.* at 9, 11. The Petitioner specifically requests new permit terms involving the facility's Risk Management Plan (RMP) and Voluntary Risk Reduction Plan (VRRP[6]) to address HF/MHF. *Id.* at 11.

The Petitioner also argues that Ultramar does not have enough insurance to cover a HF/MHF release, and the Petitioner requests that the Permit include a requirement for an additional surety bond. *Id.* at 10, 11.

*EPA Response:* For the following reasons, the EPA denies the Petitioner's request for an objection on this claim.

The EPA appreciates the Petitioner's concerns about the impacts of a potential release of HF or MHF, the Petitioner's desire that Ultramar phase out these chemicals from the refinery's alkylation process, and the Petitioner's suggestion that Ultramar obtain additional insurance. However, the title V permitting process is not the appropriate venue to resolve these issues. As explained earlier in this Order, and as explained by SCAQMD when responding to comments, title V permits have an important, but somewhat limited, function: to collect and assure compliance with applicable requirements based on the CAA. *See* RTC at 1. Accordingly, to demonstrate a basis for the EPA to object to a permit, a petitioner must demonstrate that the permit does not include, assure compliance with, or otherwise satisfy a CAA-based requirement. Here, the Petitioner does not identify any applicable requirement with which the Permit does not comply. 40 C.F.R. § 70.12(a)(2)(ii).

The Petitioner primarily frames Claim 3 as a claim under EO 13985. The EPA takes seriously its obligations under EO 13985 to advance racial equity and support for underserved communities.

---

[6] The Petition alternatively refers to the facility's VRRP (Voluntary Risk Reduction Plan) and RRP (Risk Reduction Plan), and also occasionally uses the abbreviation RRP to refer to a Risk Reduction Program. Given that each of these plans or programs appear to refer to the same set of SCAQMD-administered requirements, this Order uniformly uses the label VRRP.

However, that Executive Order does not provide a basis for the EPA to object to a title V Permit for the Ultramar Refinery, for several reasons. As an initial matter, no public comments raised any arguments concerning EO 13985, and therefore those arguments cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v). But even if EO 13985 had been raised in public comments, that Executive Order would present no basis for the EPA's objection. EO 13985 is not based on the CAA, and it is therefore not itself an "applicable requirement" of the CAA that the Permit must satisfy. Further, Executive Orders like EO 13985 apply to the federal government, but not to state and local air agencies that issue title V permits under their own EPA-approved program rules. Because EO 13985 is not legally binding on SCAQMD, the EPA cannot object to the permit issued by SCAQMD based on any alleged failure of the Permit to satisfy EO 13985.

The Petitioner also briefly mentions the facility's RMP under 40 C.F.R. part 68, and the Petitioner requests that the EPA require updates to that plan to address the Petitioner's concerns with HF and MHF. Petition at 11. The EPA cannot provide the requested relief through this title V petition process.

As an initial matter, the EPA acknowledges that the part 68 requirements, including the requirement for certain sources to prepare an RMP, are "applicable requirements" for purposes of title V.[7] However, when the EPA issued its title V (part 70) regulations in 1992 and its part 68 regulations in 1996, the Agency acknowledged that the part 68 RMP program was different from other "applicable requirements" and, unlike most other applicable requirements, it "was not intended to be primarily implemented or enforced through title V." 57 Fed. Reg. 32250, 32275 (July 21, 1992); see 61 Fed. Reg. 31668, 31688–89 (June 20, 1996).

Among other reasons, this is because permitting authorities responsible for issuing title V permits are not necessarily responsible for directly implementing the RMP program and typically have a limited oversight role.[8] Here, SCAQMD is the permitting authority responsible for issuing Ultramar's title V permit, but the EPA is the "implementing agency" responsible for more directly implementing and overseeing the federal RMP program. See RTC at 2. This division of responsibility—somewhat unique to the RMP program—is an important feature of the EPA's part 68 regulations. See 40 C.F.R. § 68.3 (definition of "implementing agency"). The EPA summarized the division of responsibility between permitting authorities and implementing agencies as follows:

> EPA agrees that oversight of the adequacy of part 68 compliance, including RMPs, is not an appropriate activity for the air permitting authority and is more appropriately an implementing agency duty. . . .
> ***
> EPA agrees that the review for quality or adequacy of the RMP is best accomplished by the implementing agency . . . .
> ***

---

[7] These requirements are based on CAA § 112(r)(7), and the definition of "applicable requirement" in the EPA's title V regulations specifically includes "any requirement concerning accident prevention under section 112(r)(7) of the Act." 40 C.F.R. § 70.2.

[8] The EPA's regulations identify certain limited oversight roles that permitting authorities (or other delegated agencies, identified by the state), may undertake with respect to assessing a facility's compliance with part 68 requirements. See 40 C.F.R. § 68.215(e); 61 Fed. Reg. at 31691.

[I]mplementing agencies will be responsible for such tasks as reviewing RMP information, auditing and inspecting a percentage of sources annually, requiring revisions to the RMP as necessary, and assisting the permitting authority in ensuring compliance.

61 Fed. Reg. at 31689, 31691, 31704.

Accordingly, in finalizing the part 68 rules, EPA determined that "generic terms in [title V] permits and certain minimal oversight activities" would be sufficient to assure compliance with part 68 RMP requirements. 61 Fed. Reg. at 31689. The EPA's part 68 regulations specify the limited extent to which RMP-related requirements must be addressed through title V permitting. See 40 C.F.R. § 68.215. In summary, a title V permit for a source that is also subject to the RMP program must identify the RMP as an applicable requirement, and the facility must indicate that it is complying with RMP requirements when it submits annual title V compliance certifications. 40 C.F.R. § 68.215(a). As the EPA explained when establishing the part 68 rules: "Except for the provisions of § 68.215(a), EPA does not believe that the RMP or all or any portion of the remainder of part 68 should become permit conditions . . . ." 61 Fed. Reg. at 31690.[9]

In sum, title V permits are not required to contain information related to an RMP beyond the requirements specified in 40 C.F.R. § 68.215. The Petitioner does not allege that the Permit does not satisfy or include the requirements of 40 C.F.R. § 68.215.[10] Instead, the Petitioner seeks to use the title V permitting process to revise the terms of the facility's underlying RMP itself. See Petition at 11. However, that is not something that the EPA can mandate through an objection to the title V permit issued by SCAQMD.

The EPA notes that Ultramar is also subject to a similar program administered by the State of California: the California Accidental Release Prevention (CalARP) program (in addition to the EPA's part 68 RMP program). See RTC at 2, 8, 18.[11] To the extent that Claim 3 relates to portions of Ultramar's RMP developed under the CalARP program, the EPA cannot require revisions to that plan through the title V petition response process. The CalARP program does not directly implement any CAA provisions, it is not incorporated into the EPA-approved SIP, and it is not federally enforceable, but rather is governed by state law. In short, the CalARP program does not reflect an "applicable requirement" of the CAA; instead, it is what the EPA refers to as a "state-only" program. The EPA does not have any

---

[9] The EPA reiterated this position several times in the preamble to its part 68 rulemaking. See 61 Fed. Reg. at 31690 ("EPA has maintained that it is not appropriate to include risk management program elements as permit conditions . . . . As EPA has indicated, the RMP should not be submitted with the permit application or made part of the permit.").

[10] In fact, the Petitioner acknowledges part of the current Permit term that concerns RMP. See Petition at 11 (citing Permit Condition F24.1(a)). The EPA observes that Permit Condition F24.1 provides the following: "a). The operator shall comply with the accidental release prevention requirements pursuant to 40 CFR Part 68 and shall submit to the Executive Officer, as a part of an annual compliance certification, a statement that certifies compliance with all of the requirements of 40 CFR Part 68, including the registration and submission of a risk management plan (RMP). b). The operator shall submit any additional relevant information requested by the Executive Officer or designated agency." Permit Condition F24.1. This permit term is consistent with the EPA's part 68 regulations.

[11] More information about the CalARP program, including differences between California's program and the EPA's program, can be found here: https://ochealthinfo.com/services-programs/environment-food-safety/hazardous-materials-waste/california-accidental-release.

9

oversight over how that program is implemented, and the EPA cannot object to a title V permit or require changes to a title V permit based on concerns related to that program.[12]

The Petitioner also briefly mentions the facility's VRRP and requests that the EPA require updates to that plan to address the Petitioner's concerns related to HF and MHF. Again, the EPA cannot provide the requested relief. The facility's VRRP is based on a local rule: SCAQMD Rule 1402. *See* RTC at 3–5.[13] That local rule is not based on any CAA requirement, it is not incorporated into the EPA-approved SIP, and it is not federally enforceable. In short, it is not an "applicable requirement" of the CAA. The EPA does not have any oversight over that local rule, and the EPA cannot object to a title V permit or require changes to a title V permit based on concerns related to that local rule.

### C.  Claim 4: The Petitioner Claims That "Continued Refinery HF/MHF Use Needs to Be Put Under TSCA and RCRA."

*Petition Claim:* The Petitioner raises additional concerns with HF/MHF at the Ultramar refinery and requests permit terms that "go beyond the requirements of the [CAA] and [EO 13985]" in order to conform with the Toxic Substances Control Act (TSCA) and Resource Conservation and Recovery Act (RCRA). Petition at 12. The Petitioner suggests that the Permit include a number of measures, including ongoing inspections of piping and connections and an improved assessment or inventory of the amount of HF and MHF used or stored at various parts of the Ultramar refinery. *See id.* at 12–13.

*EPA Response:* For the following reasons, the EPA denies the Petitioner's request for an objection on this claim.

As an initial matter, the Petitioner's concerns regarding TSCA and RCRA were not raised in any public comments, and the Petitioner has not demonstrated that it was impracticable to do so or that the grounds for doing so arose after the public comment period. Accordingly, this claim cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v).

Perhaps more importantly, as explained previously, the EPA's authority to object to a title V permit is limited to situations where a petitioner demonstrates that the permit does not satisfy CAA-based requirements. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.12(a)(2). In Claim 4, the Petitioner does not identify any CAA-based requirement with which the Permit does not comply. 40 C.F.R. § 70.12(a)(2)(ii). The EPA cannot object to a permit based on alleged problems concerning federal statutes unrelated to the CAA, such as TSCA and RCRA.

---

[12] The EPA also observes that SCAQMD does not directly implement the CalARP program; rather, it is overseen by the California Environmental Protection Agency at the state level, and, as relevant to the Ultramar refinery, by the Los Angeles Fire Department at the local level. RTC at 18.
[13] As SCAQMD explained, "Rule 1402 is not a SIP approved rule and therefore is implemented locally under the South Coast AQMD and State regulations, and these requirements are not federally enforceable." RTC at 5.

**D.     Claims 5, 6, 7, 8, 10, 11, 12, 13, 14, 16: The Petitioner Claims That "Enhanced Valero-Ultramar RMPs and RRPs [Are] Needed."**

*Petition Claim:* Claims 5, 6, 7, 8, 10, 11, 12, 13, 14, and 16 involve various allegations and requests involving Ultramar's RMP (based either on the federal part 68 program or the state CalARP program) and VRRP. Petition at 13.[14]

In Claim 5, the Petitioner claims generally that the facility's RMP and VRRP should be updated and "upgraded" in order to be properly protective of public health and safety. *Id.* at 14. Within this Claim, the Petitioner suggests a variety of permit terms related to the preparation, submission, and review of conditions in the facility's RMP—including the facility's Emergency Response Manual (ERM) and Emergency Response Plan (ERP), both of which are part of the RMP—as well as the facility's VRRP. *Id.* The Petitioner elaborates on some of these requested permit terms in subsequent claims.

In Claims 6 and 7, the Petitioner requests Permit terms mandating additional details and guidance in the facility's ERM/ERP relating to a "Category-4" catastrophic HF/MHR release, including a release that goes outside the Ultramar refinery. *See id.* at 15–20. In Claim 8, the Petitioner claims that, due to the lack of more information regarding the types of releases discussed in Claims 6 and 7, the facility's RMP is not comprehensive. *Id.* at 21. In Claim 10, the Petitioner claims that more staff and organizations at the Ultramar Refinery should have access to the ERM. *Id.* at 23.

In Claims 11, 12, and 13, the Petitioner discusses the fact that Ultramar provides information to the Los Angeles Fire Department (LAFD) as the responsible Certified Unified Program Agency (CUPA). *Id.* at 23–29. In Claim 11, the Petitioner claims that LAFD should not be the only recipient of data submitted to it, since LAFD may not have the technical breadth or resources to evaluate this information. *Id.* at 23–24. In Claim 12, the Petitioner asserts that the "Ultramar Chemical Inventory" transmitted to LAFD is incomplete due to various issues, including the units of measurement, blank entries, and the age of the inventory. *Id.* at 25–27. In Claim 13, the Petitioner alleges that the facility's submission to LAFD was further incomplete because only 7 of 286 pages of "Chemical Description" were apparently delivered. *Id.* at 28–29.

In Claim 14, the Petitioner addresses Permit tables identifying the cancer risk from various chemicals. *Id.* at 29. The Petitioner claims that these tables are incorrect because they list a value of 0.00E+00 for certain chemicals. *Id.* The Petitioner requests various changes to the Permit to better characterize cancer risks. *See id.* at 30.

In Claim 16, the Petitioner requests yearly updates to Ultramar's RMP. *Id.* at 32. The Petitioner specifically refers to a "Risk Management and Prevention Plan (RMPP) Reduction Program" and the CalARP program. *Id.* In addition to annual updates, the Petitioner requests that the RMPP include voluntary risk thresholds for HF and MHF. *Id.* Additionally, the Petitioner requests that the facility develop and update a VRRP that addresses HF and MHF. *Id.*

---

[14] The Petitioner indicates that Claims 5 through 16 implicate the facility's RMP and VRRP. Petition at 13. However, Claims 9 and 15 address different topics, and therefore this Order addresses those issues separately after addressing Claims 5, 6, 7, 8, 10, 11, 12, 13, 14, and 16.

***EPA Response:*** For the following reasons, the EPA denies the Petitioners request for an objection on these claims.

As an initial matter, many of the issues raised in Claims 5, 6, 7, 8, 10, 11, 12, 13, 14, and 16 were not raised in public comments, and therefore cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v).

Perhaps more importantly, as explained previously, the EPA's authority to object to a title V permit is limited to situations where a petitioner demonstrates that the permit does not satisfy CAA-based requirements. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.12(a)(2).

Claims 5, 6, 7, 8, 10, 11, 12, 13, and 16 relate in part to the facility's RMP.[15] Although the Petitioner does not specifically mention part 68 or any other specific federal regulations, some of these claims may have been intended to address the facility's obligations under the federal part 68 RMP rules. To the extent these claims relate to the federal RMP program, as explained in the EPA's response to Claim 3, title V permits are not required to contain information related to an RMP beyond the requirements specified in 40 C.F.R. § 68.215. The Petitioner does not allege that the Permit does not satisfy or include the requirements of 40 C.F.R. § 68.215. Instead, the Petitioner seeks to use the title V permitting process to revise the terms of the facility's underlying RMP itself, among other issues related to RMP implementation. However, that is not something that the EPA can mandate through an objection to the title V permit issued by SCAQMD.

To the extent that Claims 5, 6, 7, 8, 10, 11, 12, 13, and 16 relate to the facility's RMP obligations under the CalARP program,[16] as explained in the EPA's response to Claim 3, the CalARP program is not an "applicable requirement" of the CAA. The EPA does not have any oversight over how that state-only program is implemented, and the EPA cannot object to a title V permit or require changes to a title V permit based on concerns related to that program.

Claims 5, 14, and 16 relate in part to the facility's VRRP.[17] As explained in the EPA's response to Claim 3, facility's VRRP is based on a local rule: SCAQMD Rule 1402, and that rule is not an "applicable requirement" of the CAA. The EPA does not have any oversight over that local rule, and the EPA cannot object to a title V permit or require changes to a title V permit based on concerns related to that local rule.

---

[15] Claims 5, 6, 8, and 16 expressly mention the facility's RMP. Claims 5, 6, 7, and 10 discuss the facility's ERM or ERP, which are part of the facility's RMP. Claims 11, 12, and 13 discuss chemical storage inventory and other chemical information that Ultramar transmits to LAFD, apparently related to the facility's ERM or ERP.
[16] The only Petition claim to specifically reference the CalARP program is Claim 16. *See* Petition at 32. In addition to specifically mentioning the CalARP program, the Petitioner also mentions the "Risk Management and Prevention Plan (RMPP) Reduction Program," which was the predecessor to the CalARP program.
[17] Claims 5 and 16 expressly mention the facility's VRRP. Claim 14 concerns cancer risk tables that are part of the facility's VRRP.

### E.    Claim 9: The Petiti     r Claims That "40 CFR_Part-63_     part-UUU Applies to Alkylation Unit."

**Petition Claim:** The Petitioner claims that the facility's Alkylation and Isomerization Unit is a catalytic reforming process, subject to requirements in 40 C.F.R. part 63, subpart UUU that apply to catalytic reforming processes. Petition at 21. More specifically, the Petitioner argues that the Alkylation and Isomerization unit should be considered a catalytic reforming process because it "uses Modified Hydrofluoric Acid (MHF) as a catalyst to enable reforming of butanes and isobutanes into more profitable alkanes, such as octane." *Id.* For support, the Petitioner references a document attached to the petition (Petition Doc-17), as well as the definition of "continuous regeneration reforming" in 40 C.F.R. § 63.1579, among other things. *Id.* The Petitioner requests additional permit terms that would require the Alkylation and Isomerization Unit to comply with the requirements of Table 22 to Subpart UUU and to impose a continuous monitoring system for hydrogen chloride (HCl) emissions. *Id.* at 22.

**EPA Response:** For the following reasons, the EPA denies the Petitioner's request for an objection on this claim.

As an initial matter, no public comments raised any arguments concerning the applicability of 40 C.F.R. part 63, subpart UUU to the Alkylation and Isomerization Unit. The Petitioner has not demonstrated that it was impracticable to do so or that the grounds for doing so arose after the public comment period. Accordingly, this claim cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v). As the EPA explained in the proposal to the original title V regulations:

> The EPA believes that Congress did not intend for Petitioners to be allowed to create an entirely new record before the Administrator that the [state or local permitting authority] has had no opportunity to address. Accordingly, the Agency believes that the requirement to raise issues "with reasonable specificity" places a burden on the Petitioner, absent unusual circumstances, to adduce before the [state or local permitting authority] the evidence that would support a finding of noncompliance with the Act.

56 Fed. Reg. 21712, 21750 (May 10, 1991).[18]

Even if this issue had been raised to SCAQMD during the public comment period, it would not present a basis for the EPA's objection to the Permit. The requirements of subpart UUU are not applicable to the Alkylation and Isomerization Unit. The requirements that the Petitioner identifies or alludes to (the HCl limits in Table 22 and the HCl monitoring requirements in Table 24 of subpart UUU) apply to "catalytic reforming units." That term is defined to mean "a refinery process unit that reforms or changes the chemical structure of naphtha into higher octane aromatics through the use of a metal catalyst and chemical reactions that include dehydrogenation, isomerization, and hydrogenolysis." 40 C.F.R. § 63.1579. The alkylation process at issue in the Petition does not qualify as a catalytic reforming unit because it does not use a metal catalyst.[19] Moreover, unlike catalytic reforming processes, the

---

[18] The same principles would apply to all of the other Petition claims that were not first raised in public comments, to the extent those claims involve issues that would have been properly raised before SCAQMD in this title V permit proceeding.
[19] Instead, as the Petitioner states, the alkylation process uses MHF as a catalyst. Petition at 21. MHF—which the Petitioner states is composed of anhydrous HF and vapor pressure-reducing agents such as Sulfolane ($C_4H_8O_2S$)—is not a metal. *Id.*; *see also* Petition Doc-17 at 7 of 9.

alkylation process at issue does not use chlorinated chemicals to regenerate a metal catalyst, and accordingly this process is unlikely to emit HCl in appreciable quantities. It is therefore unclear why the Petitioner requests the non-applicable requirements from subpart UUU, which only directly address HCl, to be added to the Permit.

F.    Claim 15: The Petitioner Claims That SCAQMD Should "Update 'Statement of Findings . . . and Mitigation Monitoring Plan.'"

*Petition Claim:* The Petitioner observes that the Permit requires Ultramar to comply with a document from 2002 titled "Statement of Findings, Statement of Overriding Considerations, and Mitigation Monitoring Plan." Petition at 31 (citing Permit Condition F8.1). The Petitioner takes issue with the fact that this document is over 20 years old, and the Petitioner claims that EPA should mandate an update to this document (and to include certain requirements related to HF and MHF in the update). *Id.*

*EPA Response:* For the following reasons, the EPA denies the Petitioner's request for an objection on this claim.

As an initial matter, the Petitioner's concerns regarding this document were not raised in any public comments, and the Petitioner has not demonstrated that it was impracticable to do so or that the grounds for doing so arose after the public comment period. Accordingly, this claim cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v).

Perhaps more importantly, as explained previously, the EPA's authority to object to a title V permit is limited to situations where a petitioner demonstrates that the permit does not satisfy CAA-based requirements. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.12(a)(2). In Claim 15, the Petitioner does not identify any CAA-based requirement with which the Permit does not comply. 40 C.F.R. § 70.12(a)(2)(ii). The document identified by the Petitioner is based on a California Environmental Quality Act (CEQA) process. *See* Permit Condition F8.1 (identifying "CA PRC CEQA, 5-12-2017" as the basis for this permit term). The CEQA is not based on any CAA requirement, it is not incorporated into the EPA-approved SIP, and it is not federally enforceable. In short, it is not an "applicable requirement" of the CAA. Instead, it reflects a state-only requirement. The EPA does not have any oversight over the state's CEQA process, and the EPA cannot object to a title V permit or require changes to a title V permit based on concerns related to the CEQA.

G.    Claims 17a and 17b: The Petitioner Claims That "HF/MHF Settler and Storage Tanks Need to Be Put Under Similar Requirements as Tanks Containing Petroleum Products" and "HF/MHF Transfer Station Needs to Be Put Under Similar Requirements to the Refinery 'Gasoline Loading Dock.'"

*Petition Claims:* In Claims 17a and 17b, the Petitioner observes that Section J of the Permit lists both "Storage Tanks" and a "Gasoline Loading Rack" as air toxics sources, and the Permit includes requirements related to controls, testing, procedures, monitoring, and reporting for these emission units. Petition at 17. The Petitioner alleges that the facility's on-site storage tanks for MHF need to be put under similar controls as the tanks containing petroleum products, and that the facility's HF/MHF transfer station needs to be put under similar controls as the gasoline loading rack. *Id.* The Petitioner

asserts that this is important due to the corrosive nature of HF and MHF, the need for special piping and seal materials and flanges, and in order to protect public health and safety. *Id.*

**EPA Response:** For the following reasons, the EPA denies the Petitioner's request for an objection on these claims.

As an initial matter, the Petitioner's concerns regarding the need for air toxics standards for the HF/MHF Settler and Storage Tanks and HF/MHF Transfer Station were not raised in any public comments, and the Petitioner has not demonstrated that it was impracticable to do so or that the grounds for doing so arose after the public comment period. Accordingly, those issues cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v).

Even if these issues had been raised in public comments, they would not present a basis for the EPA's objection. As explained previously, the EPA's authority to object to a title V permit is limited to situations where a petitioner demonstrates that the permit does not satisfy CAA-based requirements. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.12(a)(2). For example, a petitioner might provide information to demonstrate that the title V permit improperly omits requirements from a NESHAP that are applicable requirements for a particular emission unit.

Here, it is unclear whether the Petitioner believes that the HF/MHF Settler and Storage Tanks and HF/MHF Transfer Station are legally subject to certain NESHAP requirements, or whether the Petitioner merely desires additional requirements that would be more protective of public health and safety (beyond what any applicable regulations would require). The latter would present no basis for the EPA's objection.

To the extent the Petitioner intended to claim that certain NESHAP standards are applicable to the HF/MHF Settler and Storage Tanks and HF/MHF Transfer Station, the Petitioner fails to demonstrate that the Permit lacks any applicable requirements for these units. The Petition contains only vague references to Section J of the Permit (which is 30 pages long and contains requirements from a variety of NESHAP standards).[20] The Petitioner does not identify any specific regulations or requirements that the Petitioner believes should also be applied to the HF/MHF settler and storage tanks or MHF transfer station, much less evaluate the relevant regulatory criteria in order to demonstrate that those regulations are applicable. Criteria for determining whether a NESHAP standard is applicable to a particular piece of equipment are included within the relevant NESHAP regulations, and these criteria generally depend on the characteristics of the emission units at issue. NESHAP standards that apply to equipment handling petroleum products may not be applicable to equipment that handles other substances, such as HF/MHF. Overall, the Petitioner's claims are too vague and general to demonstrate that any particular NESHAP standards apply to the emission units in question, or that any applicable requirements for those units are missing from the Permit.

---

[20] Regarding storage tanks, the Petitioner may have intended to refer either to the requirements for "Group 2" storage tanks regulated by 40 C.F.R. part 63, subpart CC, or "Group 1" storage tanks regulated by 40 C.F.R. part 63, subpart CC and part 60, subpart Kb, as reflected on pages 1311–13 of the Permit. Regarding loading operations, the Petitioner may have intended to refer to the requirements in 40 C.F.R. part 63, subparts CC and R, as reflected on page 1317 of the Permit. If so, the Petitioner has provided no information to demonstrate that any those standards are applicable to the HF/MHF units in question.

### H. Claim 17c: The Petitioner Claims That "Refinery Asph.t Plant Needs to Be Put Under the New SCAQMD Rule 1180.1."

*Petition Claim:* In Claim 17c, the Petitioner first addresses a Permit table that lists 27 different emission units. Petition at 33. The Petitioner states that nine of the units are designated "Unit Not Included in Plan." *Id.* The Petitioner claims that many of those units need to be "Included in Plan" before the title V permit is issued. *Id.*

The Petitioner observes that four of these units are located in the Ultramar asphalt plant. *Id.* The Petitioner notes that on January 5, 2024, SCAQMD adopted Rule 1180.1, which applies to asphalt plants. *Id.* Thus, the Petitioner claims that the Permit must be revised to comply with Rule 1180.1, and that the four asphalt plant units should be "Included in Plan." *Id.*

The Petitioner then takes issue with items in the table marked "N/A." *Id.* The Petitioner requests that the Permit specify the meaning of "N/A," and that all N/A designations should be revisited, to see if Rule 1180.1 creates a new "Now Applicable" condition. *Id.*

Finally, the Petitioner requests that Rule 1180, Rule 1181.1, and Rule 1410 should be added to a list in Section K of the Permit. *Id.*

*EPA Response:* For the following reasons, the EPA denies the Petitioner's request for an objection on this claim.

As an initial matter, none of the issues in Claim 17c were raised in public comments. Although the Petitioner's concerns regarding the newly finalized SCAQMD Rule 1180.1 could not have been raised (because that rule was not finalized until after the public comment period), the various other issues raised by the Petitioner could have been raised during the comment period. The Petitioner has not demonstrated that it was impracticable to do so or that the grounds for doing so arose after the public comment period. Accordingly, those issues cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v).

Perhaps more importantly, as explained previously, the EPA's authority to object to a title V permit is limited to situations where a petitioner demonstrates that the permit does not satisfy CAA-based requirements. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.12(a)(2). In Claim 17c, the Petitioner does not identify any CAA-based requirement with which the Permit does not comply. 40 C.F.R. § 70.12(a)(2)(ii). This claim involves a variety of SCAQMD rules. The Permit table that the Petitioner references is associated with the Permit's "Rule 1109.1 Implementation and Compliance Plan." *See* Permit at 1299–1304. Much of the Petitioner's claim focuses on the newly finalized SCAQMD Rule 1180.1. The Petitioner also briefly mentions SCAQMD Rules 1180, 1181.1, and 1410. None of those local rules are based on any CAA requirement, none of them are incorporated into the EPA-approved SIP, and none of them are federally enforceable. In short, these rules are not "applicable requirements" of the CAA. The EPA does not have any oversight over these local rules, and the EPA cannot object to a title V permit or require changes to a title V permit based on concerns related to these local rules.

I. **Claim 17d: The Petitioner Claims That "Updated Flare Minimization Plans (FMP) [Are] Needed."**

*Petition Claim:* The Petitioner asserts that the Permit must require an updated FMP under SCAQMD Rule 1118. Petition at 33. The Petitioner notes that the facility's FMP was previously updated every two years, but that it has been more than four years since the last update (on January 29, 2020). *Id.*

*EPA Response:* For the following reasons, the EPA denies the Petitioner's request for an objection on this claim.

The Petitioner does not identify any applicable requirement that would require an update to the facility's FMP under SCAQMD Rule 1118.[21] The fact that the facility's FMP has been revised on a more frequent basis in the past is not directly relevant to whether the FMP must be updated now. SCAQMD explained this in its RTC. Specifically, in responding to the Petitioner's comment requesting yearly scrutiny of the FMP, SCAQMD stated:

> A refinery is required to meet its annual $SO_x$ flaring performance target based on their year 2004 crude processing capacity. Only if the refinery does not meet the annual performance target are they required to submit a Flare Minimization Plan (FMP) in accordance with Rule 1118. The submittal of FMP is not a yearly requirement, as claimed by the comment. The purpose of the FMP is to address the issues that caused the performance target exceedance (i.e., the type of flaring that led to the exceedance) and put into place prevention measures, corrective actions, policies, and procedures to minimize or eliminate, to the extent feasible and safe, this type of flaring to occur in the future. In the case of Ultramar, a Flare Minimization Plan was submitted in 2016, 2020, and 2021 since the last Title V Renewal.

RTC at 10; *see id.* at 12. The Petitioner does not acknowledge SCAQMD's explanation (as required by the EPA's rules governing title V petitions), much less demonstrate that it was incorrect. *See* 40 C.F.R. § 70.12(a)(2)(vi). Overall, the Petitioner has not demonstrated that the facility must update its FMP.

## V. CONCLUSION

For the reasons set forth in this Order and pursuant to CAA § 505(b)(2) and 40 C.F.R. § 70.8(d), I hereby deny the Petition as described in this Order.

Dated: __October 4, 2024__

*Michael S. Regan*

Michael S. Regan
Administrator

---

[21] Unlike the other SCAQMD rules discussed in this Order, Rule 1118 *is* part of the EPA-approved SIP, and accordingly it is a federally enforceable "applicable requirement." *See* 40 C.F.R. §§ 52.220(c)(586), 70.2 (definition of applicable requirement). Thus, it is appropriate for the EPA to consider the Petitioner's claim about whether the Permit assures compliance with this SCAQMD SIP provision.

*{Exhibit-03}*

[11/8/2024]

# Publication of US EPA Administrator Petition Denial in Federal Register.

**88762**      Federal Register / Vol. 89, No. 217 / Friday, November 8, 2024 / Notices

issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. Go to *https://www.ferc.gov/ferc-online/overview* to register for eSubscription.

Dated: October 30, 2024.

Debbie-Anne A. Reese,
*Secretary.*

[FR Doc. 2024–26045 Filed 11–7–24; 8:45 am]

**BILLING CODE 6717–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

[FRL–12350–01–R9]

**Clean Air Act Operating Permit Program; Order on Petition for Objection to State Operating Permit for Ultramar Inc.**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final order on petition.

**SUMMARY:** The Environmental Protection Agency (EPA) Administrator signed an order dated October 4, 2024, denying a petition dated July 13, 2024, from Dr. Genghmun Eng. The petition requested that the EPA object to a Clean Air Act (CAA) title V operating permit renewal issued by the South Coast Air Quality Management District (SCAQMD) to Ultramar Inc. for its refinery located in Wilmington, Los Angeles County, California.

**FOR FURTHER INFORMATION CONTACT:** Nidia K. Trejo, EPA Region 9, (415) 972–3968, *trejo.nidia@epa.gov.* The final order and petition are available electronically at: *https://www.epa.gov/title-v-operating-permits/title-v-petition-database.*

**SUPPLEMENTARY INFORMATION:** The EPA received a petition from Dr. Genghmun Eng dated July 13, 2024, requesting that the EPA object to the issuance of operating permit renewal for Facility ID 800026, issued by SCAQMD to Ultramar Inc. in Wilmington, Los Angeles County, California. On October 4, 2024, the EPA Administrator issued an order denying the petition. The order itself explains the basis for the EPA's decision.

Sections 307(b) and 505(b)(2) of the CAA provide that a petitioner may request judicial review of those portions of an order that deny issues in a petition. Any petition for review shall be filed in the United States Court of Appeals for the appropriate circuit no later than January 7, 2025.

Dated: November 2, 2024.

Martha Guzman Aceves,
*Regional Administrator, Region IX.*

[FR Doc. 2024–25944 Filed 11–7–24; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–R08–SFUND–2024–0470; FRL–12305–01–R8]

**Cashout Settlement Agreement: Broderick Wood Products, Superfund Site, Adams County, Colorado, Broderick Investment Company**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of proposed agreement; request for public comment.

**SUMMARY:** Notice is hereby given by the U.S. Environmental Protection Agency (EPA), Region 8, of a Cashout Agreement between the United States on behalf of the EPA, the State of Colorado (State), and Broderick Investment Company (Settling Party), at the Broderick Wood Products Superfund Site (Site) located in Adams County, Colorado. By entering into this Settlement Agreement, the mutual objective of the Parties is to avoid difficult and prolonged litigation by allowing Settling Party to make a cash payment to address its alleged civil liability for the Site.

**DATES:** Comments must be submitted on or before December 9, 2024.

**ADDRESSES:** The proposed agreement and additional background information relating to the agreement will be available upon request and will be posted at *https://www.epa.gov/superfund.* Comments and requests for an electronic copy of the proposed agreement should be addressed to Natalie Timmons, Enforcement Specialist, Superfund and Emergency Management Division, Environmental Protection Agency—Region 8, Mail Code 8SEM–PAC, 1595 Wynkoop Street, Denver, Colorado 80202, telephone number: (303) 312–6385 or email address: *timmons.natalie@epa.gov* and should reference the Broderick Wood Products Superfund Site. You may also send comments, identified by Docket ID No. EPA–R08–SFUND–2024–0470 to *https://www.regulations.gov.* Follow the online instructions for submitting comments.

**FOR FURTHER INFORMATION CONTACT:** Kayleen Castelli, General Attorney, Office of Regional Counsel, Environmental Protection Agency, Region 8, Mail Code 8 ORC–LEB–CES, 1595 Wynkoop, Denver, Colorado 80202, telephone number: (303) 312–6174, email address: *castelli.kayleen@epa.gov.*

**SUPPLEMENTARY INFORMATION:** For thirty (30) days following the date of publication of this document, the Agency will receive written comments relating to the agreement. The Agency will consider all comments received and may modify or withdraw its consent to the agreement if comments received disclose facts or considerations that indicate that the agreement is inappropriate, improper, or inadequate.

(In accordance with the section 122(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERLCA"))

Aaron Urdiales,
*Division Director, Superfund and Emergency Management Division, Region 8.*

[FR Doc. 2024–25830 Filed 11–7–24; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OAR–2024–0446; FRL–12398–01–OAR]

**Notice of Pending Approval for Other Use of Phosphogypsum; Extension of Public Comment Period**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability.

**SUMMARY:** The Environmental Protection Agency (the EPA or the Agency) continues to seek public comment on its pending approval of a request for a *Small-scale Road Pilot Project on Private Land in Florida* submitted by Mosaic Fertilizer, LLC in March 2022, and updated by the *Revised Request for Approval of Use of Phosphogypsum in Small-scale Pilot Project,* submitted in August 2023. The Agency's review found that Mosaic's request is complete per the requirements of EPA's National Emissions Standards for Hazardous Air Pollutants under the Clean Air Act, and that the potential radiological risks from conducting the pilot project meet the regulatory requirement that the project is at least as protective of public health as maintaining the phosphogypsum in a stack. On October 1, 2024, the EPA issued a pending approval of the request subject to certain conditions, and also opened a 30-day public comment period. With this notice, the Agency is soliciting public comments for an additional 15 days.

*{Exhibit-04}*

[10/26/2024]

Appeal to Environmental Appeals Board (EAB):

CAA Appeal No. 24-11.

*This Document without Attachments or 'Certificate-of-Service' shall be known as:*
*"Doc-EE_GEng_Permit-Brief-Appeal-to-USEPA-EAB_6pp_2024-10-26.pdf" (6 pages)*

*This Document, plus 2 'Certificates-of-Service', but without Attachments, shall be known as:*
*"Doc-EE1_GEng_Permit-Brief-Appeal-to-USEPA-EAB_with-Certs_8p_2024-10-28.pdf" (8 pages),*
*for electronic submission to [www.epa.gov/eab ],*
*along with submission of 9 separate attachments:*
*'Doc-00', 'Doc-01', 'Doc-02', 'Doc-13a', 'Doc-13b', 'Doc-14', 'Doc-18', 'Doc-AA', 'Doc-BB'*

*This Document plus above referenced 9 Attachments, but excluding 'Certificate-of-Service' shall be known as:*
*"Doc-EE2_GEng_Permit-Brief-Appeal-to-USEPA-EAB-with-Attachments_2024-10-26.pdf"*

**Permit Brief Appeal by Genghmun Eng ("Citizen", "Petitioner")**
**to US EPA Environmental Appeals Board ("EAB")**
**Regarding Denial of Citizen Petition No. IX-2024-14**
**in its entirety by US EPA Administrator Michael S. Regan**
**on 4 October 2024 in the matter of:**
**Region 9 Title-V Refinery Operating Permit Renewal**
**as constituted on May 28, 2024**
**for the Valero Ultramar Wilmington HF Refinery**
**2402 East Anaheim Street, Wilmington, CA 90744.**

**Citizen Appeal requests that the**
**US EPA Environmental Appeals Board (EAB)**
**reverse the US EPA Administrator denial decision**
**specifically for Claims #6, #7, and #12,**
**of the original Citizen Petition No. IX-2024-14 and**
**require needed Permit Additions and Modifications**
**as outlined herein.**

Submitted by:
Genghmun Eng ("Citizen")
5215 Lenore St., Torrance, CA 90503
geng001@socal.rr.com
October 26, 2024

1



**South Coast Air Quality Management District**
21865 Copley Drive, Diamond Bar, CA 91765-4178

| Title Page | |
|---|---|
| Facility ID | 800026 |
| Revision # | 149 |
| Date: | May 28, 2024 |

## FACILITY PERMIT TO OPERATE

**ULTRAMAR INC**
**2402 E ANAHEIM ST**
**WILMINGTON, CA 90744**

Electronically Submitted to:
[www.epa.gov/eab]

Electronic Copies *(excluding Certificates of Service)* Submitted to:

cc: *Michael S. Regan, Administrator of the US EPA*
*US EPA Headquarters (HQ)*
*Mail Drop: C-504-01, 109 T.W. Alexander Drive, P.O. Box 12055*
*RTP Research Triangle Park, NC 27711 {Regan.Michael@epa.gov}*

cc: *Mr. Gerardo Rios, Air Permits Manager, US EPA Pacific-Southwest Region 9*
*75 Hawthorne St., San Francisco, CA 9105 {Rios.Gerardo@epa.gov}*

cc: *Dr. Bhaskar Chandan, Senior Air Quality Engineering Manager*
*The South Coast Air Quality Management District*
*21865 Copley Drive, Diamond Bar, CA 91765 {BChandan@aqmd.gov}*

Copy of:
Citizen Permit Brief Appeal to US EPA Environmental Appeals Board ("EAB")
Submitted by US Postal Service Mail to:

cc: *Ultramar, Inc., 2402 E. Anaheim St., Wilmington, CA 90744*
*(excluding Attachments and Certificate of Service)*

2

**Citizen Permit Brief Appeal: Abstract with 2 Prayers that EAB Concur with:**

*BPA-01:  As part of operating an HF Refinery, Valero-Ultramar Shall Develop a Risk Management Plan (RMP) specifically for all stages of a Category 4 Catastrophic HF Release, including those that go "Outside the Refinery", and have it vetted as adequate by the SCAQMD and the US-EPA.*

*BPA-02:  Valero-Ultramar Shall Develop and Maintain a Proper and Accurate Modern-day Chemical Inventory, which: [BPA-02-i] Contains no [BLANK] amounts for chemical quantity, and [BPA-02-ii] Contains no fictitious units of quantity such as [OTHERS]; and [BPA-02-iii] Release it to the LAFD CUPA, SCAQMD, US-EPA , so that the LAFD CUPA, SCAQMD, US-EPA and its related agencies can perform a proper assessment of the risks to Public Health and Safety that can arise from Refinery Operation, including the development of proper and accurate modern-day Disaster Mitigation Plans (DMP), especially for Refinery Category 4 Catastrophic Releases.*

3

*Documents from Original Citizen Petition of 7-15-2024 to US EPA Administrator Michael S. Regan*

**Doc-00: 7/15/2024 33-page Original Citizen Formal Petition.**
*Filename: "Doc-00_GEng_Amended_Petition-to-US-EPA-Administrator_33pp_2024-07-15.pdf"*
Original Citizen Formal Petition re: Valero-Ultramar Wilmington HF Refinery, Facility ID 800026. Ssubmitted to US EPA Adminstrator Michael S. Regan. Identifier *"Final-Title-V"* was used to indicate a hypothetical future document, with all Citizen elements and concerns taken into account, beyond what was vetted by the US EPA Region 9 in the 'Facility EPA-Permit to Operate (Version #149 of 5-28-2024)', which was called *'EPA-Permit'*.

**Doc-01: 5/10/2024 29-page Prior Citizen Emergency Petition.**
*Filename: "Doc-01_GEng_Emergency-Petition-to-USEPA-Region-9_re-Ultramar-Title-V-renewal_29pp_2024-05-10.pdf"*
Citizen Emergency Petition to the US EPA Region 9 staff, dated 10 May 2024, appealing SCAQMD 5/28/2024 decision to grant a Valero-Ultramar *Title-V EPA-Permit Renewal' {"EPA-Permit"}*, and further requesting *EPA-Permit* additions and modifications to be properly protective of the Public Health and Safety.

**Doc-02: 6/18/2024 US EPA Region 9 Staff Response to 5/10/24 Citizen Emergency Petition.**
*Filename: "Doc-02_US-EPA_Region9-letter-to-Citizen_re-Ultramar-Refinery_2024-06-18.pdf"*
Letter of June 18, 2024 to Citizen from US EPA Region 9 Staff accepting the *EPA-Permit* as-is, with no *EPA-Permit* changes. Region 9 Staff noted Citizen should submit a Petition directly to US EPA Headquarters (HQ).

**Doc-13: 12/25/2023 693-page LAFD CUPA PRA Request Data Respomse.**
**[NOT included in this EAB appeal because of its size.]**
This is a 693-page document that Citizen called *"LAFD-2022"*, as an identifier. It is 54.7 KB in size, and it was included it in its entirety in the Original Citizen Petition. Citizen notes that this document release by the CUPA overseeing the Refinery Facility was the result of a PRA (Public Records Act) request by the Torrance Refinery Action Alliance (TRAA). In this EAB appeal, two important large extracts from *LAFD-2022* are included here instead, as *"Doc-13a"* and *" Doc-13b"*.

**Doc-13a: 12/25/2023 63-page Valero-Ultramar Chemical Inventory.**
*Filename: "Doc-13a_Valero-Ultramar-Chemical-Inventory_LAFD-CUPA-pp236-294_of-693pp_12-25-2023a.pdf"*
This Valero-Ultramar Chemical Inventory was extracted from the original 693 page document release from the Los Angeles Fire Department (LAFD) CUPA (Certified Unified Public Agency), containing all the *Refinery – CUPA* written communications in their records, which originally was pp. 236-294 of 693 pages.

**Doc-13b: 12/25/2023 186-page Valero-Ultramar ERM/ERP.**
*Filename: "Doc-13b_Valero-Ultramar-ERM-ERP_LAFD-CUPA-pp304-489-of-693pp_12-25-2023b.pdf"*
The entire Valero-Ultramar ERM (Emergency *Filename: "Doc-02_US-EPA_R*Response Manual) and ERP (Emergency Response Plans) was extracted from the original 693 page document release from the Los Angeles Fire Department (LAFD) CUPA (Certified Unified Public Agency), containing all the *Refinery – CUPA* written communications in their records, which originally was pp. 304-489 of 693 pages.

**Doc-14: 7/15/2024 10-page Citizen Extract from LAFD-2022 Document Highlighting Insufficiencies.**
*Filename: "Doc-14_LAFD-CUPA_10-page-extract_from-693pp-LAFD-PRA-Release_2023-12-25c.pdf"*
Original Citizen Petition extracted 10 pages from the 693-page *"LAFD-2022"* highlighting various insufficiencies. Every insufficiency is a defect or flaw in the *EPA-Permit* Record, or the *EPA-Permit* Process. As such this Citizen Petition prayed that the US EPA Administrator request and require all identified defects and flaws to be corrected, prior to issuance of a *Final-Title-V*.

**Doc-18: 4/452024 19-page SCAQMD Responses to Prior Public Comments re-Valero-Ultramar Title V Renewal.**
*Filename: "Doc-18_AQMD_Ultramar_800026_616101_04052024_Comments-and-Responses_19pp_2024-04-05.pdf"*
SCAQMD Detailed Responses to Citizen and TRAA President Mr. Steve Goldsmith with respect to their objections and concerns regarding the *Draft-Title-V*. SCAQMD noted their decision was that no *EPA-Permit* changes were being made in spite of Citizen and TRAA objections and concerns.

## Additional Document attachments to this Citizen Appeal Petition of 11-2-2024 to the US EPA EAB.

*"Doc-AA_USEPA-Administrator_GEng-USEPA-Petition-Denied-in-its-entirety_17pp_2024-10-04.pdf"*
*"Doc-BB_USW-United-Steelworkers_A-Risk-Too-Great_60pp_2010. pdf"*
*"Doc-EE_GEng_Permit-Brief-Appeal-to-USEPA-EAB_6pp_2024-10-28.pdf"* {Short Name for this Document}.

4

# Citizen Permit Brief Appeal: Background and Rationale for EAB Claims Relief

**BPA-01: As part of operating an HF Refinery, Valero-Ultramar Shall Develop a Risk Management Plan (RMP) specifically for all stages of a Category 4 Catastrophic HF Release, including those that go "Outside the Refinery", and have it vetted as adequate by the SCAQMD and the US-EPA.**

On p.12 of Administrator Regan's Petition Denial, he states: "*..title V permits are not required to contain information related to an RMP beyond the requirements specified in 40 C.F.R. § 68.215. The Petitioner does not allege that the Permit does not satisfy or include the requirements of 40 C.F.R. § 68.215*", which includes the registration and submission of the <u>RMP</u> (Risk Management Plan).

Citizen Petition Claims #6 and #7 to the USEPA Administrator found severe defects in the Valero-Ultramar Emergency Response Manual (ERM) and Emergency Response Plan (ERP) portion of their RMP. Citizen claims that Administrator Regan erred in not concurring with the severity of these ERM/ERP defects, and not granting Citizen Petition Claims #6 and #7. Citizen further claims that Administrator Regan erred in not using *40 C.F.R. § 68.215* to help justify his concurrence with the validity of Claims #6 and #7.

As a result, in this Permit Brief Appeal Citizen prays that the EAB concur with Citizen that these defects, detailed next, are so severe that the RMP, which includes the ERM/ERP, does satisfy *40 C.F.R. § 68.215*. Citizen thus prays for EAB reversal of Administrator Denial of Claims #6 and #7, and seeks EAB concurrence the RMP, which includes the ERM/ERP, does not satisfy *40 C.F.R. § 68.215*. Citizen Permit Brief Appeal Defect Details follow:

Defect #1: As detailed by Petitioner on p.16 of 33, for a Category 4 Catastrophic HF Release, the primary ERP "plan" is to "Activate Emergency Response Plan", which is self-referential and therefore offers no actual guidance for a Category 4 Catastrophic HF Release.

Defect #2: The Valero-Ultramar ERP only advises in Table 2-2 in FD/ERT paragraph 2, for a "typical response to the incipient stage of an emergency". This typical response does not apply to Category 4 Catastrophic HF Releases, because the "incipient stage of an emergency" means it has not yet become a Category 4 Catastrophic HF event. Thus, that ERM/ERP advisement provides no guidance for a Category 4 Catastrophic HF Release.

Defect #3: The same Table 2-2 notes that: "The possibilities of other emergencies that may occur are too numerous to discuss in detail", so that NONE are discussed, thereby providing no actual guidance for a Category 4 Catastrophic HF Release.

Defect #4: Citizen in his Petition Claim #7 Citizen asserts that there is a 100% certainty that a Valero-Ultramar Category 4 Catastrophic HF/MHF release scenario will go 'Outside the Refinery'. This assertion has not been challenged by the US-EPA, and should be considered as factual. However, Valero-Ultramar only considered HF/MHF release scenarios that go 'Outside the Refinery' up to Category 3. There is no Valero-Ultramar ERM/ERP covering Category 4 Catastrophic HF Releases that go 'Outside the Refinery'. Petitioner finds that having Valero-Ultramar simply ignore this type Category 4 Catastrophic HF Release risk constitutes Defect #4.

Enabling Valero-Ultramar operate with such a defective ERM/ERP means that the Valero-Ultramar ERM/ERP cannot be construed as being equivalent to them having submitted an RMP for Category 4 Catastrophic HF Releases. Furthermore, these defects also demonstrate that the SCAQMD erred in their assertion, on p. 13 of 19 in their "South Coast AQMD Staff Responses to Public Comments" that "The refinery has a comprehensive Risk Management Plan" (RMP).

In consideration of these above defects, which constitutes a large portion of the Citizen Petition Claims #6 and #7, Petitioner maintained there is no actual Valero-Ultramar RMP that specifically covers Category 4 Catastrophic HF Releases, including those that go "Outside the Refinery", as compared to covering only smaller releases or only the "incipient stage" of a major release.,

Citizen Petition Claims #6 and #7 requested that Valero-Ultramar, as part of Refinery Operation, be required to develop an actual RMP for Category 4 Catastrophic HF Releases, that: [i] includes all HF Release stages beyond just the "incipient stage", and [ii] includes Category 4 Catastrophic HF Releases that go "Outside the Refinery", and [iii] cures the above Defects #1-#4; and [iv] have it vetted as adequate by the SCAQMD and US-EPA, prior to granting a Final-Title-V Permit Renewal.

5

**BPA-02: Valero-Ultramar shall develop and maintain a proper and accurate modern-day Chemical Inventory, which: [BPA-02-i] Contains no [BLANK] amounts for chemical quantity, and [BPA-02-ii] Contains no fictitious units of quantity such as [OTHERS]; and [BPA-02-iii] Release it to the LAFD CUPA, SCAQMD, US-EPA , so that the LAFD CUPA, SCAQMD, US-EPA and its related agencies can perform a proper assessment of the risks to Public Health and Safety that can arise from Refinery Operation, including the development of proper and accurate modern-day Disaster Mitigation Plans (DMP), especially for Refinery Category 4 Catastrophic Releases.**

Citizen in his Petition Claim #12 to the USEPA Administrator alleged severe defects in the Valero-Ultramar *EPA-Permit Record,* which are severe enough that they prevent the LAFD CUPA, SCAQMD, US-EPA, and other agencies from a proper assessment of the risks to Public Health and Safety can arise from Valero-Ultramar HF Refinery Operation; and because of the severity of these defects, they need to be cured prior to granting a Final-Title-V Permit Renewal; and furthermore, that these defects all violate:

"Section K(25){(Permit) Administration}" [*Draft-Title-V* {p. 1352 of 1381} & *EPA-Permit* {p. 1339 of 1369}]: *"All records, reports, and documents required to be submitted by a Title-V Operator to AQMD or EPA shall contain a certification of accuracy consistent with Rule 3003(c)(7) by a responsible official (as defined in Rule 3000. [3004(a)(12)]".*

The two most critical defects that need curing, as identified by Citizen in his Petition Claim #12 are:

[Defect-I]: Many items in the 55-page LAFD-CUPA released 'Ultramar Chemical Inventory' comprise a deficient and incomplete *EPA-Permit Record,* because many listed chemicals with a proper unit of quantity, such as *'pounds'* or *'gallons'*, have an amount that is BLANK, including one of the most hazardous chemicals in the Inventory, which is Hydrogen Fluoride.

[Defect-II]: Many items in the 55-page LAFD-CUPA released 'Ultramar Chemical Inventory' comprise a deficient and incomplete *EPA-Permit Record,* because many chemicals are listed with a fictitious unit of quantity called *'Others'*, instead of an actual unit of quantity such as *'pounds'* or *'gallons'*.

Administrator Regan noted in his Petition Denial that:

*"In Claim 12, the Petitioner asserts that the "Ultramar Chemical Inventory" transmitted to LAFD is incomplete due to various issues, including the units of measurement, blank entries, and the age of the inventory." [Doc-AA, p. 11-of-17]."*

*"As an initial matter, many of the issues raised in Claims 5, 6, 7, 8, 10, 11, 12, 13, 14, and 16 were not raised in public comments, and therefore cannot now be raised in this title V Petition. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.8(d), 70.12(a)(2)(v)." [Doc-AA, p. 12-of-17]."*

Citizen notes here that [Doc-AA, p.11-of-17] shows that the existence of the above [Defect-I] and [Defect-II] was not challenged by Administrator Regan, thus they remain as serious continuing concerns.

Citizen further notes here, that while Administrator Regan [Doc-AA, p.12-of-17] claimed "many of the issues raised … were not raised in public comments", these two particular issues [Defect-I] and [Defect-II] were raised in the prior Public Comment document entitled: ***"Doc-01_GEng_Emergency-Petition-to-USEPA-Region-9_re-Ultramar-Title-V-renewal_29pp_2024-05-10.pdf"***, as NOTE II:IX and NOTE II:X on pp.15-16 of 29.  Thus, the above admonishment [Doc-AA, p. 12-of-17] by Administrator Regan does not apply to these two particular items, so that Citizen has the proper standing to bring these [Defect-I] and [Defect-II] concerns to the EAB.

Citizen further asserts that, aside of the above two substantive notes regarding Citizen Petition Claim #12, Administrator Regan in his blanket Citizen Petition Denial [Doc-AA] offered no other reasons for denying Claim #12.  Therefore, in this Citizen Permit Brief Appeal now brings these two concerns to the EAB, and prays for proper adjudication of the above [Defect-I] and [Defect-II] prior to granting a Final-Title-V Permit Renewal.

6

*{Exhibit-05}*

[11/7/2024]

EAB Dismissal of CAA Appeal No. 24-11

Due to Lack of Jurisdiction.

*A D*

**ENVIRONMENTAL APPEALS BOARD**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C.**

|  |  |
|---|---|
| In re Ultramar Inc. )<br>)<br>South Coast Air Quality Management )<br>District Title V Operating Permit Renewal )<br>for Facility ID 800026 ) | CAA Appeal No. 24-11 |

## ORDER DISMISSING PETITION FOR LACK OF JURISDICTION

Petitioner Genghmun Eng filed a "Permit Brief Appeal" asking the Environmental
Appeals Board to "reverse" Administrator Michael Regan's Order Denying a Petition for
Objection to a Title V Operating Permit (Title V Petition No. IX-2024-14) issued by the South
Coast Air Quality Management District to the Ultramar Inc. refinery in Los Angeles County,
California. As explained further below, the Board has does not have jurisdiction to review the
Administrator's order. Accordingly, the Board dismisses this appeal for lack of jurisdiction.

As stated in previous orders, the Board is a tribunal of limited jurisdiction. The Board's
authority is limited by the statutes, regulations, and Administrator's delegations that authorize
and govern the Board's authority. *See In re Tewa Women United, Dr. Maureen Merritt, and
Concerned Citizens for Nuclear Safety*, CAA Appeal No. 15-03, at 2 (EAB May 15, 2015)
(Order Dismissing Petition for Lack of Jurisdiction); *In re Stericycle Inc.*, CAA Appeal No. 13-
01, at 4-5 (EAB Nov. 14, 2013) (Order Dismissing Appeal for Lack of Jurisdiction); *In re DPL
Energy Montpelier Elec. Generating Station*, 9 E.A.D. 695, 698 (EAB 2001). Where the Board
lacks jurisdiction, it dismisses the appeal.

In this case, Genghmun Eng filed with the Agency a petition pursuant to CAA section 505(b)(2), 42 U.S.C. § 7661d(b)(2), requesting that the Administrator object to the Ultramar Title V operating permit. CAA section 505(b)(2) specifically provides that the Administrator may not delegate the authority to object to a Title V permit.[1] That section also provides that a denial of a petition to object is subject to judicial review under CAA section 307 (42 U.S.C. § 7607). CAA § 505(b)(2), 42 U.S.C. § 7661d(b)(2).[2] Thus, although Petitioner may have a forum available in which to seek relief, that forum is not the Board. The Board has no authority to review the Administrator's Order Denying A Petition For Objection To A Title V Operating Permit. As such, this appeal is dismissed for lack of jurisdiction.

So ordered.[3]

**ENVIRONMENTAL APPEALS BOARD**

Dated: November 7, 2024

By: _____

Ammie Roseman-Orr
Environmental Appeals Judge

---

[1] Additionally, as the Board has previously explained, "nothing in the Clean Air Act or in part 70 grants the Board jurisdiction to review Title V permits issued by approved states pursuant to part 70." *In re Sierra Pacific Indus., Anderson Div.*, 16 E.A.D. 375, 381 (EAD 2014).

[2] The Clean Air Act includes timing and venue requirements for seeking review. CAA § 307(b), 42 U.S.C. § 7607(b).

[3] The three-member panel deciding this matter is composed of Environmental Appeal Judges Aaron P. Avila, Mary Kay Lynch, and Ammie Roseman-Orr.

- 2 -

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing *Order Dismissing Petition for Lack of Jurisdiction* in the matter of Ultramar Inc., CAA Appeal No. 24-11, were sent to the following persons in the manner indicated:

### By Email:

Michael S. Regan
Administrator
U.S. EPA
Attn: Operating Permits Group Leader
Mail Drop: C-504-01
109 T.W. Alexander Drive
P.O. Box 12055
RTP, NC 27711
regan.michael@epa.gov
titleVpetitions@epa.gov

Bhaskar Chandan
Senior Air Quality Engineering Manager
South Coast Air Quality Management
District
21865 Copley Drive
Diamond Bar, CA 91765
BChandan@aqmd.gov

Gerardo Rios
Air Permits Manager
Region 9, U.S. EPA
75 Hawthorne St.
San Francisco, CA 94105
rios.gerardo@epa.gov

Genghmun Eng
5215 Lenore St.
Torrance, CA 90503
geng001@socal.rr.com

### By First Class Certified Mail/ Return Receipt Requested:

Ultramar, Inc.
2402 E. Anaheim St.
Wilmington, CA 90744

Dated: _____

*Annette Duncan*
Annette Duncan
Administrative Specialist

*{Exhibit-07}*

[9/24/2023]

Petitioner Initial Public Comments,

Valero-Ultramar Title-V Permit Renewal.

**Citizen Concerns for Needed Improvements and Enhancements of Present-day
Proposed Renewal of Ultramar Valero Wilmington Refinery ('Refinery') Title-V Permit**
Submitted on 24 September 2023
by Dr. Genghmun Eng ("Citizen"), 5215 Lenore Street, Torrance, CA 90503

**Please add the following Public Notes and Comments to the Public Record on this item, and take
these additional factors into consideration in your rule-making in order to be properly protective
of the Public Health and Safety.**

**NOTE 1:** Refinery Aging Infrastructure poses a substantial Public Health and Safety hazard, both to
communities surrounding the Refinery, and to workers and visiting personnel within the Refinery
fenceline. As such each Title-V Permit renewal needs to include requirement that enhanced Public
Health and Safety measures be instituted at the Refinery, and to have those enhancements performed and
reported on an ongoing basis, and in a timely manner: [1A.1] On a publicly available Refinery web-site;
and [1A.2] To the CalEPA and SCAQMD. The Refinery enhancements that are performed and reported
should include: [1B.1] The Refinery Risk Factor (RRF) that is identified; [1B.2] An inventory of the
Refinery Infrastructure Assets (RIA) that are associated with identified RRF; and [1B.3] A Refinery
Risk Reduction Plan (RRRP) for RRF mitigation; and [1B.4] Net Refinery Risk Reduction (RRR)
achieved to date on each identified RRF.

**NOTE 2:** Components of the RRRP should include an evaluation of options, including (2A.1) Repair,
(2A.2) Replacement with an upgraded or new component, (2A.3) Replacement using an alternative item
or technology, and (2A.4) Removing the RRF hardware.

**NOTE 3:** Once critical component of aging Refinery infrastructure are Above-Ground Refinery
Pipelines (AG-RP). This component consistently been demonstrated to be a Refinery 'weak-link' that
has been associated with the root-cause of many nationwide Refinery disasters, both large and small,
often occurring with the injury or loss of human life. Therefore AG-RP should be considered as a
statutory RRF. Therefore, [3A.1] An RIA should be compiled for all AG-RP with a diameter of 1-inch
or larger, that are in-service for transporting Refinery fluids; and [3A.2] An RRRP should be developed
for each AG-RP, including emergency procedures for small, medium, and large-scale AG-RP breaches.

**NOTE 4:** Each AG-RP RRRP should include: [4A.1] A schedule for enhanced AG-RP inspection for
identification of pipeline wall thinning, [4A.2] Mandatory AG-RP inspection points at [4A.2i] Each
elbow joint, and [4A.2ii] At 6" to 1' prior to the elbow joint; where the direction of Refinery fluid flow
in the AG-RP is from the [4A.2ii] inspection point to the [4A.2i] inspection point.

**NOTE 5:** Another critical component of aging Refinery infrastructure are all the RIA associated with
the Refinery Alkylation Unit ('Alky'). The Alky contains at various points: (a) Pressurized and liquified
Anhydrous Hydrogen Fluoride (A-HF), (b) Gaseous or liquid Hydrogen Fluoride (HF), (c) Hydrofluoric
Acid (HFA), (d) Modified Hydrofluoric Acid (MHF), (e) Gaseous or liquid Butane (Bu) including n-
Butane and Isobutane, among (f) Other Chemicals. HFA is HF associated with water ($H_2O$) on a
molecular scale. MHF is HF with additives, predominately Sulfolane (Su), to reduce its HF vapor
pressure. MHF is usually delivered to the refinery with composition ~90wt% HF, ~10wt% Sulfolane.
The Refinery uses a closed-loop pressurized fluid circulation system, with *Settler Tanks* that contain
predominately MHF pressurized liquid with an gaseous HF-Bu overlayer. Parts of the Alky unit have a
gaseous (HF; Bu) layer above a concentrated Su-liquid as a method for Su-recovery. Thus the *Settler
Tanks*, AG-RP leading to and from the *Settler Tanks*, AG-RP associated with Alky operation, and the
Alky unit itself may all have HF concentrations much higher than the delivered MHF. Because any
large-scale Refinery HF/MHF release presents an the extreme Public Health and Safety hazard, the Alky
AG-RP, and the Alky unit itself should be considered as a statutory RRFs, requiring the development of
a much more comprehensive RRRP, as compared to AG-RP associated with the FCCU.

*{Exhibit-08}*

[9/25/2023]

Petitioner Follow-on Public Comments,

Valero-Ultramar Title-V Permit Renewal.

**Additional Citizen Concerns for Needed Improvements and Enhancements of Present-day Proposed Renewal of Ultramar Valero Wilmington Refinery ('Refinery') Title-V Permit**
Submitted on 25 September 2023
by Dr. Genghmun Eng ("Citizen"), 5215 Lenore Street, Torrance, CA 90503

**Please add the following Public Notes and Comments to the Public Record on this item, and take these additional factors into consideration in your rule-making in order to be properly protective of the Public Health and Safety.**

**NOTE-A:** The AQMD Released Version (1381 pages) purports to be a complete Public Document available for Public Comment. However, pages 1297-1300 list only the following:
"APPENDIX B: Modeling Files"
"Electronic Files Submitted via the South Coast AQMD Portal"
"This page intentionally left blank."
As such, those "Electronic Files" need to be made publicly available, and a new the 30-day Public Comment period for that material should be created and properly noticed. Since Citizen cannot foretell how that new information impacts the already disclosed 1381 page document, the entire combination of those "Electronic Files" and the present 1381 page document also needs to be part of this additional Public Comment and Public Review period.

**NOTE-B:** Appendix A, Tables 11-12, "Maximum Exposed Residential [Table 11] / Worker [Table 12] Cancer Risk Summary After Implementation of Risk Reduction Measures" contains two categories of tabulated entries under the column heading "Sum of RISK_SUM". One category are non-zero numerical values which range from 4.52E-06 to 3.44E-12. The other is 0.00E+00. There is NO ZERO RISK chemical. These tables need to be re-done with Valero's numerical values publicly disclosed.

**NOTE-C:** Appx. A, Table 12, Page A-86 lists:

| | "Sum of RISK_SUM" |
|---|---|
| PAHs-w/ | 0.00E+00 |
| PAHs-w/o | 4.62E-10 |

A naive observer might believe "w/" means "with", and "w/o" means "without". With or without What? This needs to be fixed and clarified, with the results made available for Public Comment, further supporting the necessity of the above **Note-A** and **Note-B** being implemented, so that a more complete document can be made available for Public Comment & Public Review.

**NOTE-D:** Appx. A, Table 12, Page A-86 lists a DieselExhaustPM value under "Sum of RISK_SUM", which likely does not take into account the fact that a lot of PM-2.5 down to PM-0.1 and smaller form known substrates for PAH accumulation. As part of the Title-V operating permit, collection of PM and Black Carbon need to be routinely collected and properly analyzed for their PAH content, with those results made Publicly available.

**NOTE-E:** Appx. A, Table 9, Page A-80, and Table 14, Pages A-90 and A-91 all list 0.00E+00 values for HF, SULFUR DIOXIDE, and NITROGEN OXIDE under "Sum of RISK_SUM". These are likely an improper, unacceptable, and incorrect values. This is another reason why "Appendix B: Modeling Files" needs to subject to Public Disclosure and Public Review, as in the above **Note-A**. To the best of Citizen's present knowledge:

(E-1) Acute HF exposure is a known risk during HF/MHF transfer from Tankers into the facility.

(E-2) Spent catalyst dust is routinely collected and shipped off-site for proper hazardous waste disposal. Workers involved in this activity wear hazmat suits, and the dust is quarantined in hazardous waste bags. Fresh catalyst dust, just removed from the FCCU is known to have volatile contaminants on the catalyst dust particles. These should count as 'Fugitive Emissions', which need to be put under proper US-EPA and AQMD monitoring and inventory, as they are likely a source of SOx and NOx.

**NOTE-F:** The Ultramar Voluntary Risk Reduction Plan totally ignores any possibility or need for Risk Reduction associated with the potential for large-scale HF/MHF releases, and the potential for Above-Ground Refinery Pipeline (AG-RP) aging, breakage, or leakage. Ongoing enhanced AG-RP inspection, monitoring, evaluation, with schedules for repair and replacement need to be made part of this document for how to OPERATE a Refinery in a manner that is more protective of the Public Health and Safety. The SCAQMD and CalEPA need to set standards and mandates for this AG-RP Risk Reduction, as part of the Title-V operating permit, instead of relying on 'Voluntary Risk Reduction Plans', which ignore statutory risks including such as aging AG-RP effects.

**NOTE-G:** The Ultramar Risk Reduction Plans need to include timelines for worst-case scenarios, due to Earthquakes, Terrorist Attacks, Cyber-attacks, and Accidents.

**NOTE-H:** Pages 975-976 disclose 39 Floating Roof Tanks on site. Two of them, constructed in 1981-1982 time frame, hold 'Alkylate' product. Since 'Alkylate' is produced using anhydrous HF/MHF as a catalyst, the 'Alkylate' product may contain residual HF/MHF traces. Much of this could evaporate as 'fugitive emissions', thus continuous sensitive HF monitoring is needed for these tanks, especially since HF corrodes metals differently than normal acids, which is why Monel(R) is generally used in Alkylation Unit piping, instead of less expensive steels. The present Permit makes no distinction between how these tanks are monitored, compared to the other 37, which is a potential additional HF/MHF usage risk that needs special attention, where attendant details need to be added to this permit.

**NOTE-I:** What processes are used to monitor the different corrosion rates of Alkylation piping, storage tanks, flanges, etc., as different from FCCU piping, storage tanks, flanges, etc., as even a small amount of HF/MHF impurity can significantly affect the hardware. Ignoring that difference is one of the root causes associated with the Valero Memphis HF accident and release in the AM of 12/3/2012. All these processes and process differences need to be put into the permit as part of OPERATING an HF Refinery, instead of just having predominantly a list of the hardware that is used on site.

**NOTE-J:** All the Alkylation Unit tanks, storage vessels, piping, their materials, and their inspection schedule needs to be clearly and separately disclosed and inventoried, plus the modeling reasons why those inspections have been deemed sufficient, given the HF interaction with materials has properties that are very different from the FCCU hardware. The present Title-V permit is either silent or obscure as to this potentially critical hardware safety hazard.

**NOTE-K:** What is the model Valero Ultramar uses to PREDICT wall thinning of pipes and erosion of seals with time, and how do those models differ between the FCCU hardware and the Alkylation hardware? What criteria does Valero Ultramar use for this, that they believe is 'safe enough'? How is the transition handled between these two material types, being Monel-Centric vs Non-Monel. These are all Public Health and Safety issues associated with the OPERATION of an HF Refinery, which needs to be made part of the Title-V permit, and made available for Public Comment and Review, in order for the Public to better assist both the SCAQMD and the US-EPA in identifying and controlling the risks of aging Refineries.

**NOTE-L:** What happens in an HF/MHF disaster? What should happen during a large-scale emergency involving HF/MHF hardware. What are the plans and controls, emergency procedures, staff training, and how much practice in simulated emergency response are actually done? Plans are needed for small HF/MHF releases, medium-size HF/MHF releases, large-scale HF/MHF releases, extreme HF/MHF releases, and huge-earthquake or terrorist or cyber-attack mediated releases. The details for each of these categories needs to be specified in the Title-V permit, including Refinery plans for coordination with Police, Fire, and other Public Agencies, again as part of refinery OPERATION.

**NOTE-M:** In the present 1381-page proposed Title-V permit, pages 1022-1151, or 130 pages, almost 10% of total Title-V Permit text, are devoted to Valero Ultramar Rule 1118 Flare Minimization Plans, which is updated yearly. Much of this enhanced scrutiny arises due to major unplanned SOx releases associated with unplanned flaring events. So when something bad happens, the SQMD 'closes the barn door after the horses already escaped'. The Public Health and Safety hazard of the SCAWMD acting in a significant manner only after a serious accident is a philosophy that cannot be afforded to the potential for HF/MHF releases during a Refinery accident. Therefore enhanced yearly scrutiny and reporting, both to the Public, the SCAQMD, and the US-EPA needs to be done, with those processes and procedures made part of this Title-V Permit, which will govern for the next 5 years.

**NOTE-N:** Much progress has been made since 2015 in the development of new technology safer replacements for HF/MHF use, such as Ionic Liquid Catalysis. A yearly review of why Valero Ultramar has not yet begun on a conversion plan away from HF/MHF Alkylation needs to be mandated by the Title-V Permit, with those results made Public yearly, with Public Comments being allowed. It should be part of a continuing "HF/MHF Risk Minimization Plan", with what actions and progress were achieved, with that information also being made Public, with Public Comments allowed.

**NOTE-O:** Regarding control of PM emissions in the proposed Title-V permit, pp.284-291: Historically PM emissions were only controlled to the PM-10. The present proposed Title-V permit suggests to continue to do what they have previously done, as 'good enough' for the Public Health and Safety. Like the HF/MHF concerns, science and technology keep advancing, including a improved and better understanding of the increasing amount hazard to the Public Health and Safety that both PM emissions and continued HF/MHF use create.

**NOTE-P:** As a concrete historical example of the **Note-O** concerns, the 'rainout' models used by virtually all Refineries prior to the 1987 Nevada Desert Koopman HF-Release Test assumed that nearly 100% of the released HF would fall harmlessly to the ground as 'rainout', whereas 0% 'rainout' actually occurred. Instead, an ongoing ground-hugging toxic cloud formed, which traveled for miles, which could have killed virtually all humans in its path. Meanwhile the HF/MHF unit was built and installed way before this test, on the theory that the HF/MHF risk to human life was minimal, even under a worst-case scenario where all the HF/MHF emptied out from its original Refinery use area, because of this theoretical 'rainout'.

**NOTE-Q:** The time is now for the new Title-V Permit this facility to add in SCAQMD and US-EPA controls of PM-2.5. Time also for the new Title-V Permit to require mandatory steps to be taken to phase out MH/MHF usage. A good suggestion for this enhanced Valero effort would be to mandate, over this next 5-year permit period, that Valero Ultramar build, test, and operate a parallel small-scale to medium-scale Ionic-Liquid or equivalent new technology Alkylation process, in preparation for an eventual transition to this type of safer alternative. These steps need to be explicitly added as conditions in the Title-V permit, for continued operation of this Title-V Refinery.

**END-OF-CITIZEN-ADDITIONAL-NOTES-AND-COMMENTS**

*{Exhibit-11}*

[undated]

10-page Extract from 693-page

LAFD-CUPA

Document Release of 12/25/2023.

# VALERO-ULTRAMAR CUPA DOCUMENT

{p. 310 of 693}

**Ultramar, Inc.**
DBA Valero Wilmington Refinery

CUPA Document
(Certified Unified Program Agency)

Ultramar, Inc.
Risk Management Program (RMP)
Is captured in their "ERM"
'Emergency Response Manual'

---

UNIFIED PROGRAM CONSOLIDATED FORM

**BUSINESS OWNER/OPERATOR IDENTIFICATION**

FACILITY INFORMATION

Page 1 of 1

## I. IDENTIFICATION

FACILITY ID# | F A - | 0 1 9 0 7 9

BUSINESS NAME (Same as FACILITY NAME or DBA – Doing Business As)
Ultramar Inc., DBA Valero Wilmington Refinery

BEGINNING DATE: March 2012
ENDING DATE: March 2013
BUSINESS PHONE: 562 491-6877

BUSINESS SITE ADDRESS
2402 East Anaheim Street

CITY: Wilmington
STATE: CA
ZIP CODE: 90744

DUN & BRADSTREET: 00-917-4921
SIC CODE (4 digit #): 2911

COUNTY: Los Angeles

BUSINESS OPERATOR NAME: Mark Plair
BUSINESS OPERATOR PHONE: 562 491-6677

## II. BUSINESS OWNER

OWNER NAME
Ultramar Inc., DBA Valero Wilmington Refinery
OWNER PHONE: 1 866-428-6537

OWNER MAILING ADDRESS
2402 East Anaheim Street

CITY: Wilmington
STATE: CA
ZIP CODE: 90744

## III. ENVIRONMENTAL CONTACT

CONTACT NAME: Natalie Irwin
CONTACT PHONE: 562 491-6890

CONTACT MAILING ADDRESS
P.O. Box 93102

CITY: Long Beach
STATE: CA
ZIP CODE: 90809-3102

## IV. EMERGENCY CONTACTS

-PRIMARY-

NAME: John Briones
TITLE: Superintendent Emergency Services
BUSINESS PHONE: 562 495-5460
24-HOUR PHONE: 1 866 428-6537
PAGER #: 562 394-7015

-SECONDARY-

NAME: Jason Lee
TITLE: Director Environmental Health & Safety
BUSINESS PHONE: 562 491-6608
24-HOUR PHONE: 1 866 428-6537
PAGER #: 562 394-7020

ADDITIONAL LOCALLY COLLECTED INFORMATION:

Certification: Based on my inquiry of those individuals responsible for obtaining the information, I certify under penalty of law that I have personally examined and am familiar with the information submitted and believe the information is true, accurate, and complete.

SIGNATURE OF OWNER/OPERATOR OR DESIGNATED REPRESENTATIVE
DATE: 2/7/13
NAME OF DOCUMENT PREPARER: M.Gee-Olson

NAME OF SIGNER (print): Jason Lee
TITLE OF SIGNER: Director Environmental Health & Safety

ULTRAMAR-VALERO CERTIFICATION
OF FINANCIAL RESPONSIBILITY
GENERAL COMMERCIAL LIABILITY {p. 567 of 693}
LIMIT OF $1,000,000 PER OCCURRENCE

ACORD® CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: |
|---|---|
| Aon Risk Services Southwest, Inc. Houston TX Office 5555 San Felipe Suite 1500 Houston TX 77056 USA | PHONE (A/C, No, Ext): (866) 283-7122  FAX (A/C, No): 800-363-0105  E-MAIL ADDRESS: |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A: ACE American Insurance Company | 22667 |
| INSURED | INSURER B: | |
| Ultramar Inc. One Valero Way San Antonio TX 78249 USA | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

COVERAGES    CERTIFICATE NUMBER: 570006277042    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS. Limits shown are as requested

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | COMMERCIAL GENERAL LIABILITY ☒ | ☒ | | HDO G27139254 | 01/01/2017 | 01/01/2018 | EACH OCCURRENCE | $1,000,000 |
| | ☐ CLAIMS-MADE ☒ OCCUR | | | SIR applies per policy terms & conditions | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | |
| | | | | | | | MED EXP (Any one person) | $1,000,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $1,000,000 |
| | ☒ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $1,000,000 |
| | ☒ OTHER: | | | | | | | |
| A | AUTOMOBILE LIABILITY | | | ISA H08551750 | 01/01/2017 | 01/01/2018 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ☒ ANY AUTO | | | SIR applies per policy terms & conditions | | | BODILY INJURY (Per person) | |
| | ☐ OWNED ☐ SCHEDULED AUTOS ONLY AUTOS | | | | | | BODILY INJURY (Per accident) | |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | |
| A | ☒ UMBRELLA LIAB ☒ OCCUR | | | XOU G27845012 | 01/01/2017 | 01/01/2018 | EACH OCCURRENCE | $2,000,000 |
| | ☒ EXCESS LIAB ☐ CLAIMS-MADE | | | SIR applies per policy terms & conditions | | | AGGREGATE | $2,000,000 |
| | ☐ DED ☒ RETENTION | | | | | | | |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | | WLRC4513031 (AOS) | 01/01/2017 | 01/01/2018 | ☒ PER STATUTE ☐ OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | N/A | | SCU G47113996 | 01/01/2017 | 01/01/2018 | E.L. EACH ACCIDENT | $1,000,000 |
| | (Mandatory in NH) | | | | | | E.L. DISEASE-EA EMPLOYEE | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE-POLICY LIMIT | $1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Evidence of coverage for the policies of the policy.

Cancellation Provision or whom herein is subject to shorter or longer time periods depending on the jurisdiction of, and reason for, the cancellation.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| State of California State of Water Resources Control Board Attn: Division of Financial Assistance PO Box 944212 Sacramento CA 94244-2120 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE  Aon Risk Services Southwest Inc. |

ACORD 25 (2016/03)

©1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

ULTRAMAR-VALERO CERTIFICATION OF FINANCIAL RESPONSIBILITY (but only) FOR UNDERGROUND STORAGE TANKS {p. 558 of 693}

State of California
State of Water Resources Control Board
Division of Financial Assistance
P.O. Box 944212
Sacramento, CA 94244-2120

(Instructions on reverse side)

For Board Use Only:

## CERTIFICATION OF FINANCIAL RESPONSIBILITY
### FOR UNDERGROUND STORAGE TANKS CONTAINING PETROLEUM

A. I am required to demonstrate Financial Responsibility in the required amounts as specified in California Code of Regulations (CCR), Title 23, Division 3, Chapter 16, Section 2807.

☐ 500,000 dollars per occurrence *non-marketers #10 Appl/ins*
or
☒ 1 million dollars per occurrence *(Petrol Marketers)*

AND

☒ 1 million dollars annual aggregate  *1-100 tanks*
or
☐ 2 million dollars annual aggregate  *>100 tanks*

B. I, *Valto Wilmarth Kinsey* , hereby certify that it is in compliance with the requirements of Section 2807.
   Name of Tank Owner or Operator

California Code of Regulations, Title 23, Division 3, Chapter 18, Article 3, Section 2807.
The mechanisms used to demonstrate financial responsibility are required by Section 2807 are as follows:

| C. Mechanism Type | Name and Address of Issuer | Mechanism Number | Coverage Amount | Coverage Period | Corrective Action | Third Party Comp |
|---|---|---|---|---|---|---|
| *State Clean-up Fund does not elify for Corr (two) W.F.s.* | | | | | | |
| | | | | | | |
| | | | | | | |

Note: This is a sample certification of a petroleum UST owner or operator using the State Cleanup Fund as the Financial responsibility mechanism, in conjunction with the state alternative mechanism "Letter from Chief Financial Officer." For additional information and requirements refer to Title 23, Division 3, Chapter 18, of the California Code of Regulations and Division 20, Chapter 6.75 of the California Health and Safety Code.

Note: If you are using the State Fund as any part of your own certification of financial responsibility, your execution and submission of the certification also certifies that you are in compliance and shall maintain compliance with all conditions for participation in the Fund. See instructions.

| D. Facility Name | Facility Address |
|---|---|
| Facility Name | Facility Address |
| Facility Name | Facility Address |

| E. Signature of Tank Owner or Operator | Date | Name and Title of Tank Owner or Operator |
|---|---|---|
| Signature of Witness or Notary | Date | Name of Witness or Notary |

TITLE: Original - Local Agency          Copies - Facility/Stamp

CW (Revised 1997)

# VALERO-ULTRAMAR EMERGENCY RESPONSE MANUAL {RMP Equivalent}

{pp. 316-510 of 693}

Ultramar, Inc.
Risk Management Program (RMP)
Is captured in their ERM
"Emergency Response Manual"
Which Includes their **ERP**
"Emergency Response Plan"

---

VALERO WILMINGTON REFINERY

EMERGENCY RESPONSE MANUAL

## TABLE OF CONTENTS

PREFACE

**EMERGENCY RESPONSE PLANS**

Part 1    Discovering and Reporting an Emergency
Part 2    Emergency Categorization and Representative Actions
Part 3    Building/Area Emergency Action Plans
Part 4    Non-Refinery Personnel
Part 5    Emergency Reporting Stations

**EMERGENCY RESPONSE ORGANIZATION**

Part 6    Response Organization and Duties
              General
              Site Command and Emergency Response
              Incident Command
              Operations Process Control
              Security
              Safety
              Medical
              Emergency Operations Center

Part 7    Response Systems and Equipment
Part 8    Detection, Alarm and Communication Systems
Part 9    Incident Critique
Part 10   Training

**APPENDICES**

Appendix A   Abbreviations
Appendix B   Cal-OSHA Cross Reference
Appendix C   Complaint Summary Guidelines
Appendix D   Public Statement Guidelines
Appendix E   Refinery Fire Prevention Plan
Appendix F   Earthquake Emergency Preparedness
Appendix G   Cross Reference of Related Ultramar Documents
Appendix H   Hazardous Materials Decontamination
Appendix I   Site Safety Plan and ICS Forms

VALERO-WILMINGTON ERP (Emergency Response Plan), p. 339 of 693

**"Category 4 Catastrophic Release"**

Activation of emergency alarm

Management and emergency units required

Logistics Dispatcher to notify Los Angeles City Fire Department

Emergency Operations Center will be established.

Corporate Emergency Operations Center will be established.

Catastrophic release that will require internal or external evacuation, community or agency notification, emergency units, and major clean-up effort

Examples of Category 4 Incident are:
- Catastrophic H.F. Acid release    Corrosive Chemical
- Catastrophic LPG release    Flammable
- Catastrophic Pipeline rupture with spill    Corrosive or Flammable
- Catastrophic Oil Spill at Marine Terminal    Flammable

Representative Actions are listed in Tables 2.1 and 2.2.

{p. 342 of 693} Table 2.1: Flammable Liquid Vapor Release
{p. 343 of 693} Table 2.2: Corrosive Chemical Release

VALERO-WILMINGTON ERP (Emergency Response Plan), p. 343 of 693

For a Category 4 Catastrophic H.F. Acid Release

### CORROSIVE CHEMICAL RELEASE

<u>UNIT OPERATORS:</u>

1. Report emergency to Lead Process Technicians LPT. Activate Emergency Response Plan.

**NOTE: Some corrosive chemicals are not compatible with water.**

2. Check MSDS information and know the chemicals in your area.

3. Activate deluge systems if available and safe to do so without protective equipment.

4. Activate fixed monitors to control the release at its source if safe to do so without protective equipment.

5. Evacuate personnel from area.

6. Isolate equipment at a safe distance, if possible. If the area cannot be safely entered by using protective equipment that the operator has been fully trained in its use, then divert the release to a safe containment area or continue dilution of the release using monitor streams.

<u>FD/ERT:</u>

1. Position portable monitors for the most effective control of the release at its source.

2. Personnel trained in HAZMAT response will don the appropriate protective clothing and attempt to isolate the release. Activities will be restricted to the level of training received including patching/plugging barrels and drums, installing special kits, control and containment of leaks and spills, neutralization, decontamination, etc. The possibilities of other emergencies that may occur are too numerous to discuss in detail. This section was provided to show typical response to the incipient stage of an emergency.

**TABLE 2.2**

VALERO-WILMINGTON ERP (Emergency Response Plan), p. 352 of 693
No ERP for Category 4 Catastrophic HF 'Leaks Outside the Refinery'

## 2.5    HAZARDOUS MATERIAL LEAKS OUTSIDE THE REFINERY

Objectives

2.5.1   Identify the source and characterize the material.

2.5.2   Notify the appropriate local agencies.

2.5.3   Isolate the source and stop the leakage.

2.5.4   Contain the spill.

2.5.5   Clean-up the spill.

"Category 1 Minor"
Minor spill or leak of Five (5) gallons or less from a Valero owned and operated installation.

Leakage confined to land and not of sufficient quantity to cause a safety hazard or public concern.

"Category 2 Moderate"
Moderate leakage in or near a water way or any leakage of sufficient quantity to require more than a minor clean-up effort.

Security will activate management call-out.

EOC members are required to report to the refinery anticipating EOC activation at discretion of the Incident Commander or Refinery Manager

Logistics Dispatcher to notify Los Angeles City Fire Department

"Category 3 Major"
Major Oil Spill or leak in or near a waterway has caused fire or injury or any leakage that has the potential to result in a serious hazard to environment or public.

Security to activate management call-out

Logistics Dispatcher notify Los Angeles City Fire Department

Emergency Operations Center will be established

Corporate Emergency Operations Center notified

NOTE:    Appendix-H Located at the back of this ER Plan provides additional response instructions. You may also obtained additional detailed information in the Pipeline Contingency Plan and Marine Terminal Spill Response Manual.

Valero Wilmington ERP                        PART 2 - 16                        rvt. N24- March 2010 JHB
                                                                              rev. March 2010 JHB

APPENDIX H: HAZARDOUS MATERIALS DECONTAMINATION PLAN
pp. 485-487 of 693

# VALERO-WILMINGTON ERP (Emergency Response Plan), p. 468-479 of 693

## Appendix E: REFINERY FIRE RESPONSE PLAN

## 12 Page Refinery Fire Response Plan

VALERO-ULTRAMAR
NEEDS TO DEVELOP A SIMILARLY
COMPREHENSIVE
RESPONSE PLAN

For a Category 4
Catastrophic H.F. Acid Release

VALERO-ULTRAMAR
APPENDIX I, pp. 490-510
ARE FORMS FOR SITE SAFETY PLAN

PAGE 510 IS LAST PAGE OF
VALERO-ULTRAMAR ERP

---

REFINERY

FIRE PREVENTION PLAN

**1.0    GENERAL**

1.1    This facility is engaged in the refining of crude oil to make a variety of petroleum products including gasoline. Flammable and combustible materials are therefore found throughout the refinery in either processing or storage areas or at loading racks where product is transferred to or from road vehicles. Areas where crude oil or intermediate or final products are present a special ignition hazard and are identified on Figure 1.1 the Refinery Process Area drawing. These areas are hereinafter referred to as "process areas". Other areas of the refinery are referred to as "non-process areas". Non-process areas include office and other buildings found with the non-process areas. Flammable and combustible materials may be found in non-process areas, but the hazard is generally less than that in process areas. Exceptions to this are as follows:

Warehouse - Flammable Gases

Laboratory - Flammable Gases, Liquids

These building areas are subject to similar controls to those for process areas. Conversely, controls may be relaxed in certain buildings within process areas where specifically posted:

1.2    This plan addresses process and non-process areas separately. All personnel not normally assigned to process areas should pay particular attention to restrictions on entry into process areas. All potential sources of ignition, including smoking materials, electrical devices and vehicles are prohibited unless specifically authorized under the refinery Hot Work Permit system or specifically exempted from permit requirements. The Safety Department shall be consulted if there is any doubt as to whether or not any item is a potential ignition source.

1.3    This Fire Prevention Plan is intended to meet the requirements of Section 3221 of the Cal-OSHA General Industrial Safety Orders. Because fire prevention is such an integral part of the design, operation and maintenance of the refinery, numerous programs and procedures exist to prevent fires. These programs and procedures are incorporated by reference herein.

{p. 468 of 693}

Valero Refinery ERP

rev. #54- March 2010 JHB
rev.  March 2010 JHB

From the LAFD CUPA: 55 Page Ultramar Chemical Storage Inventory, pp. 236-293 of 693

p. 236

p. 260

p. 261

City of LOS ANGELES
CALIFORNIA

LOS ANGELES
FIRE DEPARTMENT
200 NORTH MAIN STREET
LOS ANGELES, CA 90012
(213) 978-3890

**Hazardous Materials System**
**BP-8: Computer Listing of Inventory Submitted**
Inspection Responsibility: VIU

Business No : FA0019079
First In : 038
Block # :

Printed on: 7/28/2011

| Business Name | : VALERO WILMINGTON REFINERY | Business Address: 2402 E ANAHEIM ST, | | Next Inspection Date: 05/15/2011 |
| Business Owner | : ULTRAMAR INC A VALERO COMPANY | WILMINGTON, CA 90744 | | SIC Code : 2911 |
| On-Site Manager | : JASON LEE | Phone # | : (562) 491-6608 | # of Employees : 440 |
| Emergency Contact | : JOHN BRIONES | Phone # | : (562) 495-5460 Ext: | Sq. Ft. of Facility : N/A |
| Alt Emergency Contact: JASON LEE | | Phone # | : (562) 491-6608 Ext: | Permit Date : 12/14/2010 |

**LOCATION: PROCESS AREA 16**

NFPA-704: N/A

*Chemical Name*
**ALKYLATE**
  *Hazard Class:*
    *HM Type*  PURE

*Max Quantity on Hand*   *State*
408.00  OTHERS   LIQUID
Storage Type:  ABOVEGROUND TANK

*Fed Haz Catg.*

  *Max %*
    *Ingredients*
    ALKYLATE (C7-C12)

*CAS #*
64741646

*Chemical Name*
**BUTANE MIXED**
  *Hazard Class:*
    *HM Type*  PURE

*Max Quantity on Hand*   *State*
1,257.00  OTHERS   LIQUID
Storage Type:  OTHER

*Fed Haz Catg.*

  *Max %*
    *Ingredients*
    N-BUTANE
    ISOBUTANE

*CAS #*
106978
75285

*Chemical Name*
**CAUSTIC POTASH WALNUT**
  *Hazard Class:*
    *HM Type*  PURE

*Max Quantity on Hand*   *State*
40,000.00  POUNDS   SOLID
Storage Type:  STEEL DRUM

*Fed Haz Catg.*

  *Max %*
  90.00
    *Ingredients*
    POTASSIUM HYDROXIDE
    WATER

*CAS #*
1310583
7732185

*Chemical Name*
**HYDROGEN FLUORIDE, ANHYDROUS**
  *Hazard Class:*
    *HM Type*  PURE

*Max Quantity on Hand*   *State*
  POUNDS   GAS
Storage Type:  OTHER

*Fed Haz Catg.*

  *Max %*
  100.00
    *Ingredients*
    HYDROGEN FLUORIDE

*CAS #*
7664393

*Chemical Name*
**IPC 6677C ADDITIVE  SC-1043**
  *Hazard Class:*
    *HM Type*  PURE

*Max Quantity on Hand*   *State*
240.00  GALLONS   LIQUID
Storage Type:  ABOVEGROUND TANK

*Fed Haz Catg.*

  *Max %*
    *Ingredients*
    ACRYLAMIDE
    TRADE SECRET-HAZARDOUS

*CAS #*

*Chemical Name*
**IPC 9315 CM ADDITIVE  SC-221**
  *Hazard Class:*
    *HM Type*  PURE

*Max Quantity on Hand*   *State*
1,000.00  GALLONS   LIQUID
Storage Type:  ABOVEGROUND TANK

*Fed Haz Catg.*

  *Max %*
    *Ingredients*
    SODIUM HYDROXIDE

*CAS #*

From the LAFD CUPA: 5 Pages Ultramar Chemical Storage Inventory, pp. 515-521 of 693

CD+

Los Angeles City Fire Department Certified Unified Program Agency
CHEMICAL DESCRIPTION (OES 2731)
California Hazardous Materials Inventory Reporting From - Chemical Description Page
DATE: *blank?*
Page 1 of 288

ONLY 7 PAGES OF 286 PAGES OF **OES-2731** RESPONSE INCLUDED
pp. 1-4, p. 176, p. 274-275

*{Exhibit-12}*

[6/18/2023]

US EPA Region-9 Staff Letter to Petitioner,

suggesting a Formal Petition.



**REGION 9**
SAN FRANCISCO, CA 94105

June 18, 2024

Genghmun Eng
5215 Lenore Street
Torrance, California 90503

Via electronic mail

Dear Genghmun Eng,

Thank you for submitting your "Emergency Petition to the US EPA for Timely and Needed Additions and Modifications to the Proposed Title V Permit Renewal for the Valero Ultramar HF Refinery" to EPA Region 9 for the Ultramar, Inc – Valero Wilmington Refinery 800026 title V permit renewal. We received your submission at the San Francisco office on May 15, 2024, during our 45-day review period (April 5 to May 20, 2024).

Because EPA Region 9 did not object to the permit, the public has 60 days to submit a petition to the EPA Administrator requesting that EPA object to the permit. We encourage you to submit a petition directly to EPA Headquarters (HQ) as we are currently in the petition period (which runs from May 21 to July 18, 2024). Any petition requesting the Administrator's objection must be submitted directly to HQ using one of the three methods identified on EPA's website, https://www.epa.gov/title-v-operating-permits/title-v-petitions.

Before submitting a petition, we encourage you to review 40 CFR 70.12 for the public petition requirements. Additionally, citizen petitions have special rules, which are contained in Clean Air Act Section 505(b)(2) and EPA's regulations at 40 CFR sections 70.8(d), 70.12, and 70.14. Among other requirements, any issue raised in the petition as grounds for an objection must be based on a claim that the permit, permit record, or permit process is not in compliance with applicable requirements of the Clean Air Act or the regulations in 40 CFR part 70. Please note that we cannot object to a permit based on concerns about health and safety that are not related to a Clean Air Act requirement. EPA's rules can be found at https://www.ecfr.gov/current/title-40/chapter-I/subchapter-C/part-70.

If you have a question about how to file a petition, please email titleVpetitions@epa.gov. If you have questions about the specific permit submittal in EPS, please contact Nidia K. Trejo at (415) 972-3968 or email R9AirPermits@epa.gov.

Sincerely,

Po-Chieh Ting
Acting Manager on behalf of

Gerardo C. Rios, PE
Manager, Air Permits Section
Air and Radiation Division

cc (via email):
Bhaskar Chandan, SCAQMD Senior Air Quality Engineering Manager, bchandan@aqmd.gov
Steven Goldsmith, President, Torrance Refinery Action Alliance, sgoldsmith84@gmail.com

https://www.ca9.uscourts.gov/efiling/edss-document-submission/

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT: EDSS

## ELECTRONIC DOCUMENT SUBMISSION SYSTEM FOR PEOPLE WITHOUT LAWYERS

1.

Are you trying to submit a NEW case for filing in the U.S. Court of Appeals for the Ninth Circuit?

**\*This question is required.**

- ⊙ Yes. This is a new case and I need a new case number assigned.
- No. I already have a case in the U.S. Court of Appeals for the Ninth Circuit and I know my case number. I am submitting documents for filing in that existing case.

2. Are you filing:

- Petition for review of a final order of the Board of Immigration Appeals
- ⊙ Petition for review of a decision of a different federal agency
- A petition for a writ of mandamus/prohibition
- Other

2. Are you filing:

- Petition for review of a final order of the Board of Immigration Appeals
- ⊙ Petition for review of a decision of a different federal agency
- A petition for a writ of mandamus/prohibition
- Other

You cannot submit this type of document through the Electronic Document Submission System (EDSS). Please mail your petition to the court:

**By U.S. Mail or commercial carrier**
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

**For those carriers who will not deliver to a U.S. Post Office box**
James R. Browning United States Courthouse
95 Seventh Street
San Francisco, CA 94103

R E C E I V E D
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

JAN 0 8 2025

FILED _____
DOCKETED _____ _____
                    DATE        INITIAL

Once your case has been opened, we will send you information including a Ninth Circuit case number. After that, you will be able to file other pleadings in that case using this system.



PME
TORRANCE, CA 90503
JAN 06, 2025

**$36.10**

S2324A501308-07

94119

RDC 07

EI 601 704 047 US

# PRIORITY MAIL EXPRESS®

**FLAT RATE ENVELOPE**
ONE RATE ▪ ANY WEIGHT

**UNITED STATES POSTAL SERVICE®** | **PRIORITY MAIL EXPRESS®**

PRESS FIRMLY TO SEAL

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

**CUSTOMER USE ONLY**
FROM: (PLEASE PRINT)    PHONE ( )

G. Feng
5215 Lenore St.
Torrance, CA 90503

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)    PHONE ( ) (310)770-9257

U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA

ZIP + 4® (U.S. ADDRESSES ONLY)
9 4 1 1 9 - 3 9 3 9

⬇ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**
PO ZIP Code  90503
Day of Delivery  ☐ 2-Day  ☐ Military  ☐ DPO
Scheduled Delivery Date (MM/DD/YY)  1/7/25
Postage  $ 36.10
Date Accepted (MM/DD/YY)  1/6/25
Scheduled Delivery Time  ☐ 10:30 AM  ☐ 12:00 PM  ☐ 3:00 PM
Insurance Fee  COD Fee
Time Accepted  ☐ AM  ☐ PM
Return Receipt Fee  Live Animal Transportation Fee
Special Handling/Fragile
Sunday/Holiday Premium Fee
Total Postage & Fees  $ 36.10
Weight  ____ lbs.  ____ ozs.
☐ Flat Rate  Acceptance Employee Initials

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY)  Time  ☐ AM  ☐ PM
Employee Signature
Delivery Attempt (MM/DD/YY)  Time  ☐ AM  ☐ PM
Employee Signature

LABEL 11-B, MAY 2021    FSN 7690-02-000-9996

PEEL FROM THIS CORNER

▪ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
▪ $100.00 insurance included.

8F July 2022

how2recycle.info

**UNITED STATES POSTAL SERVICE®**